| | |
|---|---|
| JOHN BURFORD | CIVIL ACTION NO. 05-cv-0283 |
| VERSUS | JUDGE HICKS |
| CARGILL, INC. | MAGISTRATE JUDGE HORNSBY |

## REPORT AND RECOMMENDATION

### Introduction

John Burford, later joined by other plaintiffs, filed this proposed class action suit against Cargill, Inc. based on claims that Cargill supplied the dairy farmer plaintiffs with feed inferior to what Cargill had represented it would deliver. Before the court is a Motion to Disqualify Plaintiffs' Counsel (Doc. 147) based on counsel's concurrent representation of the plaintiffs in this action and some former Cargill employees whom Cargill sued in California. The parties have filed several affidavits related to the disqualification issue, and the court permitted a hearing at which several witnesses testified. After careful consideration of the relevant evidence and the governing legal standards, the undersigned recommends that the Motion to Disqualify be denied.

### Relevant Facts

#### A. Background of the __Burford__ Case

Dr. John Burford, a DeSoto Parish dairy farmer, filed this action in state court against Cargill. He alleged that Cargill had been supplying him with a pelletized dairy feed that was

inferior to what Cargill representatives had told him he was getting. Burford alleged that he made this discovery when a Cargill salesman gave him a copy of the actual feed formulation from a mill. Cargill removed the case to this court in February 2005.

The Acme Dairy had already filed a similar suit against Cargill in Idaho, and that case went to trial in May 2005 and resulted in a jury verdict against Cargill for $7,600,000. The case settled after trial. Harry Dehaan, an Idaho attorney and dairy owner/operator, represented Acme Dairy in that case.

Counsel for Plaintiffs in this <u>Burford</u> case published a notice to farmers that this <u>Burford</u> case may become a class action suit against Cargill. Also, word of the <u>Acme Dairy</u> verdict began to spread among dairymen. Attorney Dehaan and counsel in this case were soon contacted by dairy farmers from across the country, and they joined forces. In early 2006, Burford amended his complaint in this case to include class allegations on behalf of all dairy farmers in the United States who purchased from Cargill pelletized feed for dairy cows or heifers.

Plaintiffs allege that Cargill would send nutritionists to a dairy to tailor the ingredients of feed pellets to the needs of the dairy's herd. Cargill deemed the precise ingredients trade secrets and did not reveal them to the farmer. After the initial sale, according to the allegations, Cargill would reformulate the pellet as often as weekly to substitute cheaper byproducts from Cargill's other operations. Those byproducts, the plaintiffs allege, were not

nutritionally equivalent and damaged the dairy farmers by reducing milk production, impairing reproduction, and increasing mortality and illness among the herd.

## B. Background of the California Case

Matthew Budine worked for Cargill for more than 18 years and was serving as the general manager of the Pacific Coast region when he resigned in January 2007. Four dairy nutritionists who worked under Budine also left Cargill at the same time. Budine and three of the other former Cargill employees (Brian Sundberg, Luciana Jonkman, and Todd Schwegel) formed an independent dairy consulting business named Progressive Dairy Solutions, Inc. ("Progressive"). The other departing employee, Douglas DeGroff, formed or became associated with Diversified Dairy Solutions, LLC.

Cargill filed suit in a California federal court against Progressive, Diversified, and all five former employees. It obtained a TRO and had U.S. Marshals seize computers, documents, and other items from the homes of the former employees. The suit alleged that the defendants had misappropriated trade secrets from Cargill, engaged in unfair competition, and the like. Cargill resolved its disputes with Douglas DeGroff, Diversified, and Todd Schwegel and dismissed them from the case. Progressive, Budine, Jonkman, and Sundberg, however, defended the allegations and filed a counterclaim against Cargill.

The Progressive parties, in their counterclaim, alleged that the Progressive business model did not involve the actual manufacturer of feed. Rather, Progressive would create a custom feed formulation best suited for a particular herd and allow the farmer to bid out the

feed formulation to feed manufacturers for production. The Progressive parties contrasted the business model of Cargill, which also manufactures feed and seeks to profit through the sale of the feed. Budine, Jonkman, and Sundberg alleged that they had learned that Cargill did modify and alter formulas without the knowledge of customers (as the plaintiffs in Burford have alleged).

The counterclaim set forth a description of this Burford suit and a summary of its allegations. Jonkman and Sundberg alleged that, while they worked at Cargill, several customers asked them whether feed formulas were changed. Jonkman and Sundberg allege that they relied on information provided by Cargill (later discovered to be false) and assured their dairy farmer customers that Cargill had not changed any feed formulations. Budine alleged that when he asked about the issue on behalf of Jonkman, Sundberg, and other employees, Cargill assured Budine that no unauthorized changes had been made, and Budine passed on those assurances to employees and customers.

Budine, Jonkman, and Sundberg alleged that, in the months preceding their leaving the company, they learned that Cargill had changed customer fee formulations without authorization. They alleged that the changes were made at the corporate level, causing the counterclaimants to believe it would be futile to bring the "unauthorized and illegal practices" to the attention of their superiors. They alleged that their discovery of these "false and deceptive business practices" was the reason they left Cargill. They alleged that Cargill, in an effort to destroy their reputations and credibility, embarked on a campaign to disparage

them and their new business. The counterclaim, based on these and similar allegations, asserted a number of causes of action against Cargill.

Lead counsel for Plaintiffs in this Burford case are Roy S. Payne and Sam N. Gregorio, who practice in Shreveport, Louisiana, together with Harry Dehaan of Twin Falls, Idaho. Payne, Gregorio, and Dehaan enrolled in the California case as counsel for the Progressive/Budine defendants/counterclaimants. The District Judge in the California federal court, based on affidavits and other paper submissions, granted Cargill's motion to disqualify the attorneys because of what the court found was an appearance of impropriety. Cargill, Inc. v. Budine, 2007 WL 1813762 (E.D. Cal. 2007).

## C. Hearing Permitted

Cargill filed a similar motion to disqualify in this case, and the parties submitted a number of affidavits. Plaintiffs' counsel requested a hearing to fully explore the issues, insisting that a hearing would show that the representations in the written submissions were incorrect and that there is no ground for disqualification. The court, despite reservations about the propriety of a hearing on the issue, elected to permit the hearing, which lasted several hours.

## D. Roy Payne's Testimony

Attorney Roy Payne was the first witness. He testified that his first contact with the former Cargill employees was when Burford co-counsel Harry Dehaan called him and said he had been contacted by a former Cargill employee, later learned to be Brian Sundberg, soon

after the California suit was filed and the TRO issued. Payne downloaded pleadings from the California case and sent them to Mr. Dehaan, who Payne understood was going to be talking to the former Cargill employees while he was in San Francisco that weekend. Payne and Dehaan discussed attorneys that they could recommend for the defendants in the California suit, but it never crossed Payne's mind to represent them himself.

The former employees hired the Krieg, Keller firm in San Francisco to defend them in the California case. The Burford attorneys soon got word that Krieg, Keller wanted to meet with them, so Shreveport attorneys Roy Payne and Sam Gregorio, along with Idaho attorney Harry Dehaan, traveled to San Francisco for a meeting at the Krieg, Keller office.

Payne testified that he had been researching all along what restrictions there might be on his contact with former Cargill employees. He was satisfied that the law in California permitted an attorney to contact the former employee of a corporate adversary. His intention in making the trip was to interview the former Cargill employees about their knowledge of Cargill's dairy practices.

Present at the meeting were the three Burford attorneys, Ken Keller and Chris Holland (of Krieg, Keller), and former Cargill employees Budine, Jonkman, and Sundberg. Ken Keller described to the Burford counsel a counterclaim that had been drafted but not yet filed. He stated that it was very expensive for Progressive Dairy and the former employees to pay for the cost of their defense and pursue the counterclaim on an hourly basis, so his firm recommended that the California defendants get counsel to represent them on a contingency

fee basis. The Krieg, Keller firm had a policy not to undertake contingency representation. Mr. Dehaan's name had come up as a possible attorney because of his well-known past litigation against Cargill, as well as the pending Burford case.

The Burford attorneys wanted time to consider the matter, and the meeting ended without them having any substantive conversation with the former employees. The Krieg, Keller firm filed the counterclaim about a week after the meeting. Attorney Payne testified that the Burford attorneys had "no input" into the counterclaim, and the Krieg, Keller firm filed the counterclaim after giving the Burford attorneys "just a short oral presentation." Attorney Payne continued to research the legal claims and consider whether his group could logistically handle the California case. In his research, he came across a Minnesota case where Cargill had succeeded in disqualifying class counsel in an employment case, so he was aware that was an issue he could expect to encounter. He researched other cases on the issue and determined that the key issue was for the former employee to avoid disclosing any attorney-client privileged information. Payne testified that Ken Keller reported at the meeting that he had spoken with his clients about that issue and was satisfied that they did not have any privileged information.

Attorney Kenneth Keller filed an affidavit in the California case, and Plaintiffs filed it as an exhibit at the hearing in this case. Keller testified that his clients, the former employees of Cargill, left Cargill after they discovered the accuracy of the allegations made against Cargill in the Burford suit. Keller added that he understood his clients were aware

of attorneys Dehaan, Gregorio, and Payne because of their handling of the <u>Burford</u> case. "Accordingly, [Keller] facilitated an initial meeting" between the former employees and the <u>Burford</u> attorneys. Keller testified that no confidential or privileged information was discussed, and no documents were disclosed at the meeting. He adds that his firm later consulted with his clients to determine whether they had any privileged documents or information, and the firm determined that they did not.

Two letters are attached to Keller's affidavit. The first is from attorney Keller to the <u>Burford</u> attorneys. Keller writes that his clients have accepted his recommendation that they hire the <u>Burford</u> attorneys to prosecute their counterclaim on a contingency fee basis. The second letter is from Budine, Jonkman and Sundberg to the <u>Burford</u> attorneys. They write that they have consulted with the Krieg, Keller firm about the nature of the attorney-client privilege and whether any information or documents obtained during their past employment by Cargill could be protected by the privilege. The three former employees represent that they do not believe they have in their possession or control any privileged documents (other than some electronic documents that were returned to Cargill as part of the California litigation). They added that they would not reveal to the <u>Burford</u> attorneys any potentially privileged communications, information, or documents.

The <u>Burford</u> attorneys returned to California for a second meeting on May 4, where they were presented with the letters described above. Attorney Payne testified at the hearing that they had an "open session" about the issues to ensure that the former employees had in

fact had a discussion about the issues addressed in the letters. Once the contingency agreement and other documents were signed, the <u>Burford</u> attorneys, with Mr. Dehaan participating at times by telephone, sat down with the former Cargill employees and started interviewing them about the facts of the California case. They discussed the employees' response to Cargill's allegations, what witnesses could testify on various points, and similar issues. Payne testified that time pressures in the California litigation forced them to focus on that case, and there was no discussion with the former employees about the <u>Burford</u> case. The <u>Burford</u> case was discussed only "in a general sense" in the context of why the employees left Cargill and formed their own business. The former employees did not provide any documents to the <u>Burford</u> attorneys during the May 4 meeting. Payne testified that none of the former employees told the <u>Burford</u> attorneys anything that Cargill's lawyers had ever said to them or that the former employees had said to Cargill lawyers.

Payne testified that he and Gregorio came back to Shreveport after the May 4 meeting and began to "get on top of the pleadings" in the California case and prepare for a case management conference. At that conference, near the end of May 2007, Cargill advised the judge in the California case that Cargill would file a motion to disqualify the <u>Burford</u> attorneys. The motion was filed soon afterwards and briefed. The California federal court granted the motion on June 22, 2007. Payne testified that the <u>Burford</u> attorneys had no further discussions with the former Cargill employees after the ruling, except that Payne met with them in the Krieg, Keller offices to discuss the possibility of an appeal, which he ultimately

determined was not procedurally available. The former employees soon retained California firms who took over the role of the disqualified attorneys. Payne testified that he did not see or talk to the former Cargill employees after that meeting until the day of the hearing in this case.

Payne testified that his initial purpose in traveling to California was to interview the former Cargill employees about information relevant to the Burford case but, after his arrival, the discussion turned to whether the Burford attorneys would sign on as counsel for the proposed counterclaim. Payne said that when the Burford attorneys agreed to represent the former Cargill employees in the California case, they did expect that the employees would eventually offer helpful testimony in the Burford case, but that was an expectation he had regardless of whether he represented them. Payne testified that his firm has an exclusively contingent fee plaintiff's practice, which the California case fit within, and he believed the counterclaim had merit.[1]

### E. Harry Dehaan's Testimony

Attorney Harry Dehaan testified that his first contact with the former Cargill employees was a telephone call from Brian Sundberg, who initially would not give his name. Sundberg asked questions about the Acme Dairy case, and Dehaan explained the case to him.

---

[1]The California district court later issued a series of written rulings and held a jury and bench trial on various claims and counterclaims. The end result was a dismissal of all of Cargill's claims and all of the former employees' counterclaims, with the imposition of costs on Cargill. The case is on appeal to the Ninth Circuit Court of Appeals.

Near the end of the call, Sundberg gave Dehaan his name and phone number. Sundberg called again the next day, after he had been sued, and Dehaan agreed to meet with Sundberg and Sundberg's partners in San Francisco the next day, as Dehaan was already making the trip to attend a seminar.

Dehaan said the former employees were terrified and worried about losing their homes. He tried to reassure them and told them about the homestead exemption provisions of the law. He gave them the names of attorneys who might represent them in the California case. There were no discussions at that time about Dehaan representing them. He testified that he later learned that the former employees had agreed to hire the Krieg, Keller firm, of which Dehaan was not familiar.

Dehaan testified that he agreed with the earlier testimony that described the meetings in California. He denied that he received any information from the former employees that could possibly have been communicated from Cargill's lawyers to them during their employment. He conceded on cross-examination that the contingency fee agreement with the former employees obligated him and his co-counsel to not only prosecute the counterclaim but also defend the employees against Cargill's claims.

Dehaan said the employees had told him that they had factual information that would support some of the allegations in the Burford case, and they would testify if asked, but they would not talk to Dehaan about the details of what they knew until he made a decision about whether he would be their attorney. Dehaan attributed that reluctance to their fears stemming

from Cargill's suit against them for divulging trade secrets. Dehaan admitted that he attended the meeting at Krieg, Keller with the intention of getting information from the former employees that might be helpful in <u>Burford</u>, but the Keller firm was zealous in protecting their clients and minimizing interaction with the <u>Burford</u> attorneys. He said he did not remember any former Cargill employee use the term "star witness" to describe a role he or she could play in <u>Burford</u>.

**F. Matthew Budine's Testimony**

Matthew Budine testified at the hearing that he was the general manager of the Pacific Coast business when he resigned from Cargill. He was also a member of the Cargill Dairy Vision Team for the last couple of years of his employment. That group looks at strategic marketing and business decisions for the dairy group. Budine said that he did not view litigation as part of his responsibility. He was generally aware of the <u>Burford</u> case, and it was mentioned now and then at work, but he was not involved in any strategy or tactics planning for the litigation.

Budine gave three weeks notice of his resignation, but Cargill asked him to leave immediately. Cargill soon sent him and the other departing employees a separation agreement. They also sent him a letter that generally advised him about confidential information, followed by a second letter that specifically referred to the <u>Burford</u> case and directed that information about <u>Burford</u> was to be held confidential.

Budine consulted an employment lawyer about the separation agreement, and the attorney contacted Cargill to negotiate some of the issues when, without notice, Cargill filed the California federal suit and served an order on Budine and the other former employees to seize their computers and other information. The employment lawyer advised Budine that the Cargill suit would crush the Progressive Dairy business because of the expense of defense, and the former employees were advised to find another line of work.

Before Cargill had filed its suit, rumors were going around at a dairy show that Cargill would sue the Progressive Dairy group. The former employees started asking for recommendations for counsel. Mr. Sundberg called Harry Dehaan, but other people were also consulted. Budine, Sundberg and Jonkman met with Mr. Dehaan near the Oakland airport to discuss their situation, and Dehaan referred them to some lawyers in the bay area. The former employees interviewed three or four firms and settled on the Krieg, Keller firm, which Dehaan had not mentioned. Matt Swanson, whom Budine knew from the industry, had recommended the Krieg, Keller firm.

Budine testified that attorney Keller's objective was to negotiate the TRO issues and then retain contingency attorneys. The former employees knew immediately that the defense fees would soon put them out of business. Mr. Sundberg recommended Harry Dehaan as contingency counsel, and the April 10 meeting was scheduled.

Budine testified that the Krieg, Keller attorneys met with the former employees before the meeting and set out the "ground rules" for them, including the need to keep the discussion

focused on the California case and make sure that no privileged information was given to the Burford attorneys. Budine testified that the conversations in the meetings were about the California case, and he denied sharing with the Burford lawyers any information he got from lawyers at Cargill or documents of any kind. Budine also agreed with Payne that the only topic at their final meeting was the disqualification issues and any appellate remedy.

On cross-examination, Mr. Budine said that he was familiar with the Acme Dairy verdict because he had read about it in a magazine. After Acme, Cargill was faced with the Green River Dairy case and the Baseline case. Mr. Budine admitted that he received expert reports regarding records analysis and nutritional opinions in connection with those two cases, and he was asked for his comments on the nutritional and dairy management aspects. A number of emails were introduced into evidence that showed Budine was among the recipients of correspondence, often with a Cargill attorney (Karin Nelsen) and a paralegal (Karen Gooch), that related to opinions or reports offered by experts or consultants that Cargill had retained in connection with litigation similar to the Burford case. Budine was sometimes asked for and offered his comments on the nutritional and related issues. For example, Attorney Karin Nelson asked Budine and others in Cargill to assist with the Baseline litigation in Idaho. Outside counsel had provided Budine and the others a summary of the case as well as Baseline's expert information and drafts of Cargill's external expert reports. Budine and the others were asked to review the information so that Cargill could "utilize your expertise before our final expert reports are submitted and before the mediation

that is scheduled for the <u>Baseline</u> case." Budine also received from Attorney Nelsen a copy of Cargill's mediation statement that would be submitted in the <u>Baseline</u> case, but Budine denied having any input into the statement. Budine was also among the recipients of correspondence regarding Mr. Dehaan's perceived litigation approach and discussions of how Cargill should respond to the approach. The correspondence also included a critique of Cargill's expert testimony in prior cases and a discussion of how the testimony could be improved in future litigation.[2]

Specific to the <u>Burford</u> case, Budine received email informing him and other managers that a motion had been filed to certify <u>Burford</u> as a national class action. The notice generally stated that Cargill believed it had a good defense, that the managers should anticipate promotions of the case via advertisement, and gave instructions on how to handle any media, customer, or employee inquiries about the case. Attorney Nelsen wrote Budine and other members of the Dairy Vision Team and asked them to be on the lookout for advertisements about the <u>Burford</u> case in dairy publications. An agenda for a meeting attended by Budine included the item: "Class action suit - Karin wants to discuss for 1/2

---

[2]Much of the correspondence that Cargill introduced as evidence was redacted so that the <u>Burford</u> attorneys would not be privy to its contents. Cargill filed in the record both a redacted set of exhibits and (under seal) an un-redacted set. The court has attempted to fairly summarize some of the redacted material in a fashion that will convey its relevance to the issues at hand, but without revealing any specific Cargill strategies, tactics, or confidential information.

hour," but Budine testified that Nelsen showed up only at lunch and did not discuss the Burford case.

Budine also received correspondence directing his attendance at a conference call for general managers to discuss procedures that the law department would be implementing regarding document retention and to discuss document requests that could be expected. Budine received an email from paralegal Gooch regarding an approaching visit by members of the dairy legal team to meet with people in Budine's region who would have the most knowledge on the subjects of the litigation. Budine was included among the people who would be interviewed, and paralegal Gooch advised that the team would copy certain documents from Budine's computer and paper records. Another email from Gooch to Budine and others further discussed the document collection process that would be used in connection with the class-action litigation. Budine also offered testimony in camera, which will be reviewed below.

### G. Brian Sundberg's Testimony

Brian Sundberg testified that he worked for Cargill for about eight years as a dairy nutritionist. He had the title of dairy management consultant at the time he left the company. Sundberg said that after he left Cargill he heard rumors that the company would sue the former employees who formed Progressive Dairy. He had never been sued before and did not know any attorneys, but he did know Harry Dehaan's name, and he called him for advice shortly before he was served with the California suit.

Sundberg offered testimony similar to Budine about the meeting near the Oakland airport and the attorney selection process. He said it was the idea of the Krieg, Keller lawyers that the former employees consider hiring Dehaan as their contingency fee counsel. Sundberg also described the meetings with the <u>Burford</u> attorneys similarly to Budine's description. Sundberg denied that he played any role in developing legal strategy at Cargill, that he ever talked to Cargill attorneys, or that he had any substantive discussions with the <u>Burford</u> attorneys about the <u>Burford</u> case.

Mark Carpenter is a Minneapolis attorney. His Faegre & Benson firm represents Cargill in the <u>Burford</u> case. By agreement of the parties, attorney Carpenter offered testimony in camera, with only the court, court staff, and the court reporter present. Carpenter testified in two such sessions, the first following the courtroom testimony of Brian Sundberg.

Attorney Carpenter testified that he had a conversation with Sundberg in December 2006. Sundberg told him that he had been in the office of a dairy client when the owner, Mr. Heida, received a phone call from someone associated with the <u>Burford</u> plaintiffs. Mr. Heida related to Mr. Sundberg that he had called a toll free number that he had seen in a publication and left a voice mail. Sundberg, according to Carpenter, said that Mr. Heida told the person on the phone that Cargill had done a fine job for him. (Heida's dairy later joined as a plaintiff in this case to sue Cargill.)

Heida eventually received, as a result of his call, a questionnaire, a retention agreement, and a letter from Mr. Dehaan. Mr. Sundberg obtained a copy of the documents sent to Mr. Heida, and they found their way into the hands of Cargill counsel. Attorney Carpenter testified that he talked to Mr. Sundberg about possibly executing an affidavit about the events, which Carpenter believed might support a discovery motion related to the questionnaires completed by various dairies. Mr. Sundberg said that he would prefer not to subject his customer, Mr. Heida, to the litigation process. Mr. Carpenter called Mr. Budine, who was Sundberg's superior, and Budine agreed with Sundberg.

Mr. Sundberg was questioned in camera about his visit with Mr. Heida and the related events. He did not remember many of the details, but he did not have any significant disagreements with Mr. Carpenter's recollections (despite Sundberg's earlier testimony that he never talked to a Cargill lawyer). Sundberg also offered that he and his co-defendants were being represented in the California case by two law firms, one in Los Angeles and the other serving as local counsel near the Fresno court where the case was pending. Both firms agreed to take the case on a 100% contingency fee basis.

### H. Luciana Jonkman's Testimony

Luciana Jonkman did not testify at the hearing, but Plaintiffs offered her affidavit from the California case. Jonkman testified by affidavit that she did not recall discussing the strategy, arguments, or other substantive aspects of the <u>Burford</u> case with anyone, including Cargill's lawyers. She did learn that one of her dairy customers had joined the <u>Burford</u> case,

and she asked Cargill for assurance that the company would indemnify her and pay her legal costs if she were to become involved in the case, and she received that assurance. Jonkman acknowledges that other former employees recall providing documents to Cargill lawyers sometime in 2006 (as part of the company's document collection procedure), but she has no recollection that she provided any material to Cargill lawyers. She adds that she has been instructed by her counsel not to discuss with anyone other than her Krieg, Keller counsel anything that Cargill's lawyers may have said to her or in her presence.

### I. Todd Schwegel's Testimony

Todd Schwegel testified at the hearing that he did not participate in the meeting with Harry Dehaan near the Oakland airport. He did accompany the other former employees when they interviewed potential attorneys, including the Krieg, Keller firm. He elected, after the initial consultation with counsel, to pursue a resolution of Cargill's suit against him by returning all Cargill property of any kind, leaving his job at Progressive Dairy, and starting a business from scratch under a "clean room" procedure.

Mr. Schwegel testified about a conversation he had with Mr. Sundberg. Schwegel described it as follows: "What he told me was, specifically, was that Harry Dehaan had said that he thought he (Dehaan) could help him (Sundberg) out in his case; in exchange, if Mr. Sundberg had some plane tickets show up on his doorstep, would he be willing to come to Louisiana." Schwegel added that Sundberg told him that Sundberg "thought he (Sundberg) could be a star witness in this in exchange for the information he knew." Schwegel added

that Sundberg said he could be a "star witness in exchange for (which) they wouldn't have to pay these large legal fees."

On cross-examination, Mr. Schwegel appeared less than certain about whether it was Sundberg or perhaps one of the other former employees) who said their information could be exchanged, and he was not sure if the said exchange would be for free representation or merely help in finding representation. With regard to plane tickets, Schwegel admitted that Cargill had provided him plane tickets to travel to Louisiana for the hearing. It was also drawn out that Mr. Schwegel's settlement with Cargill obligated him to pay $1,000,000, of which he had paid $12,000 and expected to make another payment of $6,000, with the remaining $982,000 to possibly be waived by Cargill if Schwegel remained in compliance with the agreement. One aspect of the agreement is a non-disparagement clause, which Schwegel said allowed him to tell the truth under oath, and he insisted that he was telling the truth at the hearing and that Cargill had not suggested to him what he should say.

Attorney Harry Dehaan returned to the stand to respond to Mr. Schwegel's testimony. He was asked if he ever told Sundberg, Jonkman, or Budine that he would compensate them in return for testimony. He answered: "I never offered money or free legal help or pro bono help in return for false testimony, and I highly resent the inference and the allegation." He denied that there was any mention of airline tickets or pro bono work.

### J. Robert Sheffer's Testimony

Robert Sheffer was the general manager in the Northeast division at the same time Mr. Budine was the general manager in the Pacific division. The two men were college classmates and fraternity brothers, and they held similar positions at Cargill throughout their careers with the company. They also served together on the Dairy Vision Team, which is made up of eight to ten persons who set the vision for Cargill's future direction.

Sheffer testified that he recalled, when he was chair of the Dairy Vision Team, that the Cargill legal team asked the group to help prepare a sort of Frequently Asked Questions document about the Burford case. He said the group provided feedback to the members of the legal team (Nelsen, Carpenter and Gooch), who generated a document that was sent to all general managers. Sheffer said he considered the feedback discussions between the legal team and the Dairy Vision Team to be privileged and confidential.

Sheffer described a conference call he had, in his capacity as a manager, with the Cargill legal team. Neither Mr. Budine nor other former employees were parties to the call, but Cargill offered Sheffer's description at the hearing in an effort to demonstrate the sort of communication that might occur between the legal team and a manager. Sheffer said the conference was geared toward scheduling the gathering of some information, but they also had "a good dialogue about ideas, thoughts, practices that we thought would be coming up in the case and any question that I asked was answered." He remembered discussions about the "ideas or thoughts or tactics that would be used" in the case.

### K. The Sunnyside Dairy Communications

Attorney Mark Carpenter, outside counsel for Cargill in this <u>Burford</u> case, testified by affidavit, in open court, and in camera. Carpenter testified that Budine emailed Carpenter to ask him for advice on how to proceed regarding Cargill's previously rejected offer to Sunnyside Dairy that Cargill write off a large feed bill in exchange for a release of liability on any performance issues with the Sunnyside herd. (Such offers later became a subject in this litigation and prompted a request to Judge Hicks to enjoin the settlement strategy.)

Attorney Carpenter replied to Budine with his advice and also offered his thoughts on how the issue might factor into class certification issues in the <u>Burford</u> case. Carpenter added that he would need Budine to keep his memory sharp on the issues so that he could provide an affidavit that Carpenter could use when he briefed the certification issue. Budine did provide an affidavit to Carpenter about the Sunnyside Dairy issues after the <u>Burford</u> plaintiffs sought injunctive relief. There was an exchange of emails among Budine, paralegal Gooch, and attorney Carpenter about the contents of the affidavit and possible revisions.

Carpenter, in camera, discussed the un-redacted email regarding the Sunnyside Dairy account. The emails show that Budine provided Carpenter information, and Carpenter responded with a legal opinion on the status of the outstanding account, as well as a brief mention of how the facts might impact class certification issues. Carpenter testified that the settlement strategy employed on the Sunnyside account had originally been proposed by Budine, and the two of them had conversations about it during the litigation of the injunction.

Budine, in camera, generally remembered the attempt to settle with Sunnyside Dairy and later conversations with attorney Carpenter about how that situation related to the request for injunctive relief in this case.

**L . Other Testimony About Budine's Role**

Attorney Carpenter testified by affidavit and in court that he had participated in approximately six privileged (in his opinion) discussions with Budine related to the <u>Burford</u> case.  He conceded on cross-examination that managers such as Budine are not decision makers with regard to litigation. Rather, Carpenter and other outside counsel looked to the Cargill in-house legal team, which received direction from executives in the home office. Accordingly, Carpenter did not present any litigation strategy to Budine in an effort to get him to approve it, though he said he was open to Budine's suggestions for any modification. Carpenter did not consider Budine to be someone who was managing the litigation.  And he conceded that he had no evidence that any of the former employees had provided any privileged documents or communications to the <u>Burford</u> attorneys.

Attorney Carpenter testified in camera that the Cargill legal team selected Budine and three other employees to serve as an internal expert team related to the <u>Baseline</u> case.  Budine was the only general manager to serve on the team, which was formed in late 2005 and continued through the end of the litigation, which was a couple of months after that.  The court asked Carpenter if he could point to any documents that specifically stated that Budine was a member of an internal expert team.   Carpenter did not identify any direct

communication that announced the team had been formed or identified it by name as the "internal expert team", but Carpenter did point to emails from attorney Karin Nelsen to Budine and the other team members that supported his testimony. (The court has noted an email from paralegal Gooch to Budine and another person in which she refers to them as part of the "internal consulting team.")

Those emails, some of which were discussed above during the summary of Budine's testimony, arranged a meeting to discuss the <u>Baseline</u> case. The recipients were told that it was important for them to review the <u>Baseline</u> expert information, drafts of Cargill's external expert reports, and a summary of the case that was drafted by outside counsel. Budine and the other three were told to do this so that the legal team could "utilize your expertise" before Cargill submitted its final expert reports and before an approaching mediation. The counsel-prepared summary referred to by Nelsen was marked "Privileged and Confidential Attorney-Client Communication" and was an executive summary of the <u>Baseline</u> case. The meeting took place on January 25, 2006, and the participants included Budine, the other members of the internal team, attorney Carpenter, paralegal Gooch, and a non-testifying consulting expert who was working with Cargill. The testifying experts later joined the conference call for the second half.

Carpenter testified in camera that the discussions included how to most effectively rebut the <u>Baseline</u> allegations through expert reports and what additional work or analysis by the experts would do that. Carpenter's notes included references to input by Mr. Budine

during the discussions. The court has reviewed Carpenter's handwritten notes, and they do include references to Mr. Budine suggesting responses to certain positions taken by the Baseline experts. Notes also indicate that Budine suggested a way to portray the plaintiff dairy and its operations to explain changes in the herd. According to Carpenter's notes, Budine also explained during the call that a rule employed by one Baseline expert was not applicable in the geographical area of the Baseline dairy. Budine also offered comments about the damages calculation.

Attorney Carpenter also testified about communications in early 2006, soon after the Burford plaintiffs indicated they would pursue class allegations. Carpenter spoke to Andrew Loder (of Cargill) about what resources could be drawn upon to defend Cargill better than was done in the Acme case. Loder suggested that Carpenter talk to Mike Watson, a Cargill business development manager who was familiar with the events leading up to the Acme case. That led to Mike Watson sending an email to attorney Carpenter, with a copy to Budine and Loder. The email offered Watson's recommendations on what issues should be emphasized or avoided to better defend against the claims in Burford. He also offered specific recommendations on how to respond to part of Mr. Dehaan's successful approach in the earlier case.

Christian Walker is an attorney with Faegre & Benson, the same firm in which attorney Mark Carpenter works. Walker testified that he works in the De Moines, Iowa office. As a second-year associate, his role in the Burford case was focused on discovery.

He testified (in open court) that he had conference calls with general managers, including Budine, to outline the litigation, some of Cargill's defenses to the class action assertions, and attempt to identify key personnel and documents relevant to the claims. Walker did not travel to the Pacific Coast region to collect documents or ever personally meet with Budine.

Attorney Carpenter testified in camera about a conference call with Budine in July 2006. Carpenter said the meetings were arranged with each general manager to learn more about the policies in each of Cargill's regions, which might bear upon class certification issues in this Burford case. Carpenter said he led off the call by summarizing the claims, describing the time frame at issue, talking about the policies he believed were most relevant, and discussing the strategy for defense of class certification. Carpenter testified that Budine pointed out some facts about the forms of Cargill feed, which Carpenter said was exactly the type of information he was looking for regarding the class issues. Budine also offered during the discussion his view that two of the allegations pursued in an earlier case were nutritionally inconsistent.

Cargill paralegal Karen Gooch testified in camera. She offered testimony similar to attorney Carpenter that Budine was on the internal expert team for the Baseline case. She said that Budine was a key member of the team and not just a document locator. The rest of her testimony largely related to correspondence and meetings that were addressed by other witnesses.

Budine also testified in camera on these subjects. He said he did not remember reading the Baseline executive summary that was emailed to him and others. The court noted that though Cargill is a large company, Budine's name kept coming up on correspondence from lawyers who were communicating about or looking for information about litigation. Budine was asked if he was part of an internal expert team or the like. He responded: "I was a go-to person in Cargill for any dairy nutrition problem across the country." He said he had traveled to Maine, Hawaii, and other areas where there had been problems arise because he had been "the type of person to go in and help fix the problem." Budine said the Baseline case was "out of my area," and he got involved because of Michael Watson (whom he perceived to be part of the problem) and was sent to California to work under him. Budine added that he believed that "from a nutritional troubleshooting standpoint I think I was their number one guy in the company."

Budine testified that he could not recall the specific conference call that Mr. Carpenter described. The court asked Budine about several points or suggestions that Carpenter's notes indicated Budine offered about the litigation that was discussed during the call. Budine expressed little memory of the matters, and said he would have offered his nutritional opinion on the issues. Budine otherwise generally downplayed his role in connection with litigation to that of a logistics coordinator, arranging for the collection of documents by the legal team or providing the names of persons who could best demonstrate a Cargill dairy system called MAX. Budine closed by saying that he understood Cargill now wanted to portray him as

"the most important person in the world" but, from his perspective, he was trying to run a

business and the lawyers were "basically asking me to go fetch things."

**Disqualification of Counsel: Basic Legal Standards**

Motions to disqualify counsel are decided based on state and national ethical

standards.  In this case, the relevant ethical rules and standards include the local rules of this

court, the American Bar Association's Model Rules and Code, and the Louisiana Rules of

Professional Conduct.  Horaist v. Doctor's Hosp. of Opelousas, 255 F.3d 261, 266 (5th Cir.

2001).  Local Rule 83.2.4W adopts the Rules of Professional Conduct of the Supreme Court

of Louisiana, and those rules are based in turn on the ABA's Model Rules of Professional

Conduct.  Id.

In considering a motion to disqualify, the court views the rules in light of the party's

rights and the public interest.  In addition to the specific rules that apply, the court considers

whether a conflict has (1) the appearance of impropriety in general, or (2) a possibility that

a specific impropriety will occur, and (3) the likelihood of public suspicion from the

impropriety outweighs any social interests which will be served by the lawyer's continued

participation in the case.  In re Dresser Industries, 972 F.2d 540, 543-44 (5th Cir. 1992).

The parties have briefed at length a number of cases, including Williams v.

Transworld Airlines, Inc., 588 F.Supp. 1037 (W.D. Mo. 1984) and others cited in the

California decision, Cargill, Inc. v. Budine, 2007 WL 1813762 (E.D. Cal. 2007), all of which

addressed motions to disqualify counsel in similar but distinct settings.  Those several

decisions, most from other district courts, contain useful discussions of the law, but none of them are controlling, and each stands on its unique facts.

**Rule 3.4(b)**

Louisiana Rule of Professional Conduct 3.4(b) provides that a lawyer shall not "offer an inducement to a witness that is prohibited by law." Cargill, pointing primarily to the testimony of Todd Schwegel, argues that the "understanding" of the former employees "appears to be" that their cooperation by testifying in the <u>Burford</u> case was being exchanged for <u>Burford</u> counsel's help in the California case, "potentially implicating" the rule. <u>See</u> Cargill's post-hearing memorandum at Doc. 201, p. 1. Cargill urges that the evidence showed that former employees had an understanding, whether nurtured intentionally by attorney Dehaan or not, that <u>Burford</u> counsel would help the employees fight Cargill in the California case in exchange for their being "star witnesses" in this case.

The evidence did not establish a violation of Rule 3.4(b). Todd Schwegel, Cargill's principal witness on the issue, could offer only that one of his fellow departing employees, and he was not sure which one, said that their information about Cargill could be exchanged, but Schwegel was not sure if the exchange would be for free representation or mere help in finding representation. Even if Mr. Sundberg or other of the departing employees considered himself a potential "star witness" in this <u>Burford</u> case - and that may yet turn out to be true - that does not mean he came to that understanding because any of the <u>Burford</u> attorneys offered him an inducement prohibited by law. Cargill's case on this point is built on the

uncertain hearsay testimony of a witness who has a $1,000,000 credibility issue, coupled with a request that the court draw from the circumstances an inference of highly unprofessional conduct when other reasonable inferences are permitted. The court has weighed the evidence, including the credibility of the witnesses, and finds that the evidence does not establish a violation of Rule 3.4(b).

**Sharing of Privileged Information**

Louisiana Rule of Professional Conduct 4.2(b) provides that a lawyer shall not communicate about a case with a person the lawyer knows is "presently" an employee of a represented organization.[3] This court has interpreted the rule and its predecessor versions to permit counsel to conduct ex parte interviews of *former* employees of a corporate or other organizational adversary, <u>provided</u> counsel does not attempt to discuss matters subject to attorney-client privilege. The approach is reflected in cases such as <u>Jenkins v. Wal-Mart Stores, Inc.</u>, 956 F.Supp. 695 (W.D. La. 1997). <u>See also</u> Dane S. Ciolino, <u>Lawyer Ethics</u>

---

[3] Rule 4.2 currently provides: In representing a client, a lawyer shall not communicate about the subject of the representation with:
(a) a person the lawyer knows to be represented by another lawyer in the matter, unless the lawyer has the consent of the other lawyer or is authorized to do so by law or a court order.
(b) a person the lawyer knows is presently a director, officer, employee, member, shareholder or other constituent of a represented organization and
(1) who supervises, directs or regularly consults with the organization's lawyer concerning the matter;
(2) who has the authority to obligate the organization with respect to the matter; or
(3) whose act or omission in connection with the matter may be imputed to the organization for purposes of civil or criminal liability.

<u>Reform in Perspective: A Look at the Louisiana Rules of Professional Conduct Before and after Ethics 2000</u>, 65 La. L. Rev. 535, 581 (2005) ("As to contacting constituents of a represented organization, a lawyer is free to communicate with any *former* employee who is not independently represented."). Cargill argues that its former employees shared privileged information with <u>Burford</u> counsel or, in the alternative, the court should presume such information was shared.

The court finds that Budine's role in the earlier and similar dairy litigation was greater than his recollection suggested. The court is persuaded by testimony, notes from meetings, and emails that demonstrate Budine was both a high-ranking manager and a member of a select group of persons who served as an internal expert or consulting team. As a member of that group of experts, as well as in his capacity as a manager, Budine was privy to communications to and from the legal team that discussed legal strategy and ideas concerning expert testimony relevant to dairy litigation. The evidence shows that Budine was not merely receiving copies of correspondence because he was a manager, but because he was actively participating in such discussions.

Attorney Carpenter's notes from one meeting show that Budine had a number of comments to offer regarding responses to experts in the <u>Baseline</u> case. Mr. Budine attempted to downplay his role by saying that he gave only his "nutritional" opinion, but it was not necessary for Mr. Budine to direct or approve legal strategy before his conversations with counsel for Cargill would be privileged. There was a meeting of internal experts (later joined

by external experts) with counsel to discuss various aspects of the expert testimony and to help counsel prepare for a mediation. It may be that the resulting reports were disclosed to the opposing party and that the principal facts that were discussed could be discovered in litigation, but the communications during that meeting were nonetheless privileged.

The evidence also showed that Budine had privileged communications with attorney Carpenter related to the Sunnyside Dairy issues and related litigation for injunctive relief. Attorney Carpenter disclosed, during those communications, some of his thoughts on how the Sunnyside matter could relate to a class certification issue. The evidence also showed that Brian Sundberg had communications with attorney Carpenter about his visit with Mr. Heida and a potential discovery motion related to the questionnaires that Burford counsel sent to potential plaintiff dairies. Accordingly, the former employees did possess knowledge of privileged communications between themselves and Cargill counsel.

The court finds that Burford counsel have demonstrated to the satisfaction of the undersigned that the former Cargill employees did not disclose to them privileged information during Burford counsel's brief representation of the former employees. The Burford attorneys and the former Cargill employees did enter into an attorney-client relationship, which is of a nature that confidences are exchanged freely, but the evidence shows that this was a unique attorney-client relationship. Before the attorneys ever spoke to the clients directly, the clients were counseled by the Krieg, Keller firm about the privilege issues, and all persons concerned put into writing their understanding that the former

employees might possess privileged information but that it was not to be shared with <u>Burford</u> counsel. Attorney Payne was persuasive in his testimony about the great care that was taken about this issue so as to avoid any impropriety. The <u>Jenkins</u> decision recognized that there "always exists a concern that former employees may disclose privileged communications," and there is risk in letting the former employees decide what is and is not privileged, but the concern "can be mitigated with an appropriately tailored order proscribing any privilege-sensitive inquiries by opposing counsel." <u>Jenkins</u>, 956 F. Supp at 696 n.2. There was no tailored order in this case, but there was great care taken by a group of lawyers who researched the issues and set forth the ground rules in writing before there was any substantive communication between the former employees and <u>Burford</u> counsel.

To the extent that there is a legal presumption that privileged information is shared during such an attorney-client relationship – and Cargill has not cited any controlling authority that mandates such a disqualifying presumption in these circumstances – the court finds that it was rebutted by the evidence at the hearing. This court, unlike some courts that have employed such a presumption, conducted a hearing, fully explored the relevant facts, and assessed the credibility and weight of the testimony. After that full exploration, the court finds that the former Cargill employees did not improperly disclose any privileged information to the <u>Burford</u> attorneys. No witness pointed to a single disclosure.

**Appearance of Impropriety**

Courts have also disqualified counsel based on an appearance of impropriety. The doctrine finds its roots in former ABA Canon 9 and the common law developed by the courts. The Fifth Circuit discussed the doctrine in Woods v. Covington County Bank, 537 F.2d 804, 812-13 (5th Cir. 1976). The Court observed: "The requirement that a lawyer avoid even the appearance of impropriety reflects the bar's concern that some conduct which is in fact ethical may appear to the layman as unethical and thereby erode public confidence in the judicial system or the legal profession." Id at 813. Thus, courts have disqualified attorneys under the appearance of impropriety doctrine even though there was no evidence of actual wrongdoing. The Fifth Circuit recognized, however, that motions to disqualify can be used for strategic purposes, and the disqualification of a lawyer based on an overly broad application of the doctrine would delay or disadvantage the affected party and give rise to its own likelihood of public suspicion of the bar and judiciary. Consequently, the Court stated that there need be no proof of actual wrongdoing, but "there must be at least a reasonable possibility that some specifically identifiable impropriety did in fact occur." Id. See also FDIC v. U.S. Fire Ins. Co., 50 F.3d 1304, 1316 (5th Cir. 1995) ("rather than indiscriminately gutting the right to counsel of one's choice, we have held that disqualification is unjustified without at least a reasonable possibility that some identifiable impropriety actually occurred.").

The court found above that the evidence does not establish to the satisfaction of the undersigned that there has been an actual violation of the Rules of Professional Conduct or the improper disclosure of privileged communications. There are, however, facts that leave at least a reasonable possibility that former Cargill employees disclosed, even inadvertently, privileged communications to Burford counsel. The California federal court issued a compelling opinion, albeit without a hearing, that expressed great concern that non-lawyer executives such as Mr. Budine could effectively communicate with his counsel about the California litigation without some disclosure. The undersigned has found, based on a preponderance of the evidence standard, that there were no disclosures, but that does not preclude a reasonable possibility that there was disclosure. Budine was a member of a team of internal experts and communicated with Cargill counsel about expert opinions, approaches to litigation and expert positions in a similar case, and he received a number of email and telephone communications from the Cargill legal team about this and similar litigation, all of which related to his reason for leaving the company and entering the California suit. Thus, objective grounds exist for an appearance of impropriety.

An attorney need not be disqualified even if there is an appearance of impropriety. The court must also find that the "likelihood of public suspicion or obloquy outweighs the social interests which will be served by a lawyer's continued participation in a particular case." Woods, 537 F.2d at 813 n.12. This requirement was also observed in Horaist, 255 F.3d at 266, when the Court stated that disqualification is proper only when the first factors

are present and "the likelihood of public suspicion from the impropriety outweighs any social interests which will be served by the lawyer's continued participation in the case." The court must keep in mind the fundamental importance of safeguarding popular confidence in the integrity of the legal system, but it also must be mindful that attorney disqualification is a sanction "that must not be imposed cavalierly." FDIC v. U.S. Fire, 50 F.3d at 316.

Any public concern about impropriety in this case was alleviated to a large extent by the quite brief time which Burford counsel had any communications with the former Cargill employees and the advance ground rules that were established. The evidence showed that the Burford attorneys never spoke directly to the former Cargill employees until May 4, 2007, and then under constant awareness of the privilege issues, and the California court ended the representation on June 22, 2007. Since that date, the evidence shows, there has been no communication between Burford counsel and the former employees except for a meeting about a possible appeal of the disqualification order. The brief duration of representation does not defeat the possibility of impropriety, but it should lessen any public concern that the Burford attorneys gained an unfair advantage in this litigation through their association with the former Cargill employees.

Another factor is the value or danger, depending on one's perspective, of what privileged communications the Burford attorneys might have learned from the former employees. The court listened to a full day of testimony from the former Cargill employees and Cargill counsel about the communications at issue. The communications have been

described in only a general sense in this Report and Recommendation, but the court heard all of the details and does not believe that the <u>Burford</u> attorneys would benefit to any meaningful extent if the court were to turn over to them the transcript of the in camera testimony and the unredacted documents. This weighs against disqualification.

There is an interest in a client maintaining the attorney of his choice. That factor is ordinarily important, but it is more important in this case. This is not a car accident or a medical malpractice case, for which there are many skilled attorneys available to take a meritorious case. Rather, this case regards complex issues of dairy nutrition and production, a field in which not many attorneys operate routinely. Harry Dehaan, however, has a unique background as a dairyman and a successful attorney for dairy owners in similar cases. It would likely be quite difficult for the <u>Burford</u> plaintiffs to replace Dehaan with an attorney of equal knowledge in the relevant area and the experience of litigating similar cases against Cargill. There is also the danger that, if current counsel are disqualified, the special characteristics of the case might leave the farmer-plaintiffs unable to locate suitable counsel who are competent to handle the potential class action suit. It would not serve the interest of society to have several dairy farmers' claims of this importance and magnitude not be presented to the courts by, and receive the attention and efforts of, the farmers' considered choice of competent and experienced counsel.

**Conclusion**

In conclusion, the court finds, under a preponderance of the evidence standard, that there were no violations of the Rules of Professional Conduct or disclosures of privileged information, but there is at least a reasonable possibility of a disclosure of privileged communication. That possibility gives rise to a potential appearance of impropriety. After considering the relevant factors, the undersigned concludes that the best interests of the public are served by permitting <u>Burford</u> counsel to continue their participation in this case. The court appreciates that Cargill holds the strong view that its position is correct, and the court respects the contrary decision of the California federal court, but, after careful reflection and consideration of the relevant law and evidence, the court finds that disqualification of plaintiffs' counsel is not appropriate in this case.

Accordingly;

**IT IS RECOMMENDED** that the **Motion to Disqualify Plaintiffs' Counsel (Doc. 147)** be **denied**.

### Objections

Under the provisions of 28 U.S.C. § 636(b)(1)(C) and Fed. R. Civ. P. 72(b), parties aggrieved by this recommendation have ten (10) business days from service of this report and recommendation to file specific, written objections with the Clerk of Court, unless an extension of time is granted under Fed. R. Civ. P. 6(b). A party may respond to another party's objections within ten (10) days after being served with a copy thereof. Counsel are

directed to furnish a courtesy copy of any objections or responses to the District Judge at the time of filing.

A party's failure to file written objections to the proposed findings, conclusions and recommendation set forth above, within 10 days after being served with a copy, shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court. See Douglass v. U.S.A.A., 79 F.3d 1415 (5th Cir. 1996) (en banc).

THUS DONE AND SIGNED in Shreveport, Louisiana, this 19th day of May, 2009.

MARK L. HORNSBY
UNITED STATES MAGISTRATE JUDGE