UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
SHREVEPORT DIVISION

JOHN BURFORD, ET AL.                    CIVIL ACTION NO. 05-0283

VERSUS                                  JUDGE S. MAURICE HICKS, JR.

CARGILL, INCORPORATED                   MAGISTRATE JUDGE HORNSBY

## MEMORANDUM RULING

Before the Court is a Motion to Dismiss (Record Document 257) filed by Defendant

Cargill, Incorporated ("Cargill").  Cargill moves to dismiss Plaintiffs' Racketeer Influenced

and Corrupt Organizations Act ("RICO") claims and fraud claims under Federal Rules of

Civil Procedure 12(b)(6) and 9(b).  See id.  Plaintiffs have opposed the motion.  See Record

Document 263.  For the reasons which follow, the Motion to Dismiss is **DENIED**.

## BACKGROUND[1]

Among Cargill's businesses is the manufacturing and selling animal feed to, among

others, dairy farmers.  See Record Document 251 at ¶ 2.  Named Plaintiffs in this class

action matter[2] are dairymen who bring this action on their own behalf and on behalf of all

dairy farmers in the United States who have purchased pelletized feed for dairy cows or

heifers from Cargill during the period from January 1, 2001 through the present.  See id.

at ¶¶ 1, 3.

Cargill sells dairy feed pellets that are marketed as designed to satisfy the nutritional

needs of mature dairy cows and heifers to maximize production and minimize health

---

[1]Because this case is currently before the undersigned on a motion to dismiss, the
Court accepts as true the factual allegations in the Fourth Amended Complaint and RICO
Case Statement.  See infra Taylor v. Books A Million, Inc., 296 F.3d 376, 378 (5th Cir.
2002); Glessner v. Kenny,  952 F.2d 702, 712 (3rd Cir. 1991).

[2]Also pending in this case is Plaintiffs' Motion to Certify Class Action (Record
Document 247).

problems.  See id. at ¶ 4.  Cargill represents that the formulation of the pellets is a proprietary trade secret and the dairy farmer is not permitted to know the ingredients.  See id. at ¶ 5.  As part of Cargill's marketing of its feed pellets, nutritionists employed by Cargill represent to the dairy farmers that the pellets are properly designed to accomplish their needs.  See id.

Plaintiffs allege that after the initial sale, Cargill changed the composition of the dairy feed pellets, in order to maximize corporate profits, without regard to the nutritional needs of the dairy cows and without notice of the changes to the dairy farmers.  See id. at ¶ 6. These changes in the composition of the dairy feed pellets substitute ingredients that are not nutritionally equivalent and cause damage to the cows, including loss of milk production, impaired reproduction, increased mortality and illness, and are detrimental to the general health of the cows.  See id. at ¶ 7.

Plaintiffs contend that Cargill's conduct constitutes common law or state law fraud, in that Cargill made material misrepresentations of fact as to the composition and fitness of its pellets, knowing the misrepresentations to be untrue, for the purpose of inducing Plaintiffs to rely upon the misrepresentations.  See id. at ¶ 10.  Plaintiffs maintain that their reliance was expected, reasonable, and justified because Cargill claimed that the specific composition of the pellets was a trade secret.  See id.

Plaintiffs further assert that Cargill's conduct constitutes a violation of 18 U.S.C. §1964(c), the RICO statute, in that Cargill has associated with an enterprise engaged in interstate commerce and conducted its affairs through a pattern of racketeering activity. See id. at ¶ 12.  Plaintiffs allege that Cargill has caused them harm in the manner set out below:

(a)   The RICO enterprise is an association-in-fact involving Cargill, CAN Technologies, Inc., David Cieslak, various mills controlled by Cargill, and others.

(1)   The enterprise relies upon a scheme devised by David Cieslak and others to allow Cargill, in concert with CAN Technologies, Inc. and various grain mills controlled by Cargill, and others, to defraud dairy farmers by taking a pellet marketed as being customized with ingredients providing the nutritional requirements of a dairy herd, and manipulating the formula for that pellet to allow the enterprise to sell by-products of the grain mills, and other inferior ingredients, at much higher prices than they could earn on the open market by including them secretly in the dairy pellet.

(2)   The enterprise relies upon technology, including software programs such as Dairy MAX, BILLS and BUCK, owned by CAN Technologies, Inc., upon which Cargill relies to facilitate and hide the reformulation of the pellets substituting inferior ingredients as described above.  The fact that this technology is owned by a separate corporation lends credence to Cargill's claims that the formulas are trade secrets, which facilitates the effort to hide the formulas from the dairy farmers, making the frequent reformulation of the pellets easier to conceal.

(3)   The enterprise also relies upon research performed by CAN Technologies, Inc., the results of which are knowingly portrayed in a misleading manner to make it easier for Cargill to claim that its nutritionally inferior by-products are nutritionally equivalent to the formulas originally devised for the dairy pellets. The use of the separate entity, CAN Technologies, Inc., to perform this research facilitated the scheme by, among other things, helping to hide the scheme from nutritionists and others who might allow the dairy farmers to learn of it.

(4)   The enterprise relies upon reformulation coordinators within Cargill to act in concert with managers at the grain mills controlled by Cargill to accomplish the substitution of the nutritionally inferior by-products without notice to the dairy farmers and often without notice to the nutritionists who designed the original formula for the pellet.

(5)   The enterprise relies upon the efforts of its members, aided by various outside law firms, to intimidate any employees who leave the employ of Cargill to prevent them from revealing any knowledge they may possess concerning the scheme, by

Page 3 of  23

> threatening to enforce broadly worded confidentiality agreements required of employees and by commencing baseless litigation against former employees who do not agree to conceal the scheme, including the assertion of specious claims that the dairy feed formulas and the software programs used to devise them are trade secrets.  Cargill also pressures former employees, such as Todd Schwegel, to join in these efforts.

> (b)    The pattern of racketeering activity within the meaning of the RICO statute includes the regular and repeated use of the mails to collect the payments from the dairy farmers who are the victims of the scheme, as well as the continuous use of the mails, and the telephone and email communication systems between the mills in different states and the reformulation coordinators within Cargill offices throughout the country to execute the scheme to substitute the nutritionally inferior ingredients and byproducts.

Id. at ¶ 12.[3]

Plaintiffs have also filed a RICO Case Statement in response to the Standing Civil RICO Order, issued by this Court on July 21, 1988, and made applicable to this case by Order dated May 7, 2010.  See Record Document 256.  The RICO Case Statement provides further detail of Plaintiffs' RICO claims:

> The predicate acts are mail fraud and wire fraud . . . , and intimidation of a witness . . . .
> The fraudulent scheme described above is a continuing scheme throughout the period from 2001 through the present affecting dairies in all 50 states. The mailings are an essential part of the scheme to defraud each and every named plaintiff and class member because these mailings are the mechanism by which Cargill collects its payments for the feed.  Cargill mails invoices to its dairy customers on a monthly basis and receives their payments by mail, as well.  There are, thus, tens of thousands of mailings to the class members in order to carry out the scheme to defraud them, which have spanned the entire period covered by the complaint from 2001 to the

---

[3]Plaintiffs also allege that Cargill's conduct constitutes a breach of the express and implied warranties of merchantability and fitness of its product for its intended purpose under the Uniform Commercial Code.  See Record Document 251 at ¶ 11.  However, Cargill is not challenging the manner in which the breach of warranty claims have been pled.  See Record Document 257-1 at 8 n. 1.

present.  Because these mailings directly result in the payment of many thousands of dollars per week by most class members, for feed which is actually detrimental to their dairy herds, the dairies are directly injured by these mailings.

The wire communications underlying the wire fraud predicate acts consist of emails and other wire communications between the reformulation coordinators for Cargill and the managers of the various feed mills where the dairy pellets are manufactured for Cargill. These communications are essential to the scheme because they are the manner by which the mill managers inform the reformulators of the availability of the by-products and other substitute ingredients and the manner by which the Cargill reformulators send back the new formulas after running the BILLS software owned by CAN Technologies, Inc.  These reformulations occur as often as weekly for each customer, so they also number in the tens of thousands over the course of the time frame at issue in this case, from 2001 to the present. These wire communications are also the direct cause of injury to the class members because they facilitate the regular substitution of nutritionally inferior ingredients which causes the decrease in milk production and health of the dairy cows.

The other predicate act is the intimidation of former employees to keep them from testifying truthfully to their knowledge of this scheme to defraud the dairy customers. Beginning in February and March of 2007, Cargill, acting through its various outside law firms, as well as through its senior management, set out to intimidate Todd Schwegel, a dairy nutritionist formerly employed by Cargill in its Pacific Coast division as a dairy management consultant. Cargill filed a lawsuit on March 1, 2007, containing objectively specious claims against Schwegel and others whom it knew had knowledge of this scheme and obtained a TRO seizing all of their computers and communication devices.  By this tactic, Cargill intimidated Schwegel into signing a confidential settlement agreement in late March 2007 requiring him to pay Cargill the sum of one million dollars if he violated a non-disparagement clause in the agreement.  In accordance with what he felt were the requirements of his settlement agreement with Cargill, Schwegel has provided testimony for Cargill in furtherance of the scheme.

Id. at ¶ 5(a) & (b).

The Court now turns to the instant motion filed by Cargill, which seeks dismissal of

Plaintiffs' RICO and fraud claims.

**LAW AND ANALYSIS**

**I.      Rule 12(b)(6) Standard.**

"To survive a Rule 12(b)(6) motion to dismiss, a complaint 'does not need detailed factual allegations,' but must provide the plaintiff's grounds for entitlement to relief-including factual allegations that when assumed to be true 'raise a right to relief above the speculative level.'" Cuvillier v. Taylor, 503 F.3d 397, 401 (5th Cir.2007), quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555, 127 S.Ct. 1955, 1964-65 (2007).  The plaintiff must plead "enough facts to state a claim to relief that is plausible on its face." Twombly, 550 U.S. at 570, 127 S.Ct. at 1974.  "When considering a motion to dismiss, the court accepts as true the well-pled factual allegations in the complaint, and construes them in the light most favorable to the plaintiff." Taylor v. Books A Million, Inc., 296 F.3d 376, 378 (5th Cir. 2002) (citation omitted).  The court generally must not consider any information outside the pleadings.  See Sullivan v. Leor Energy, LLC, 600 F.3d 542, 546 (5th Cir.2010).  However, in RICO cases, courts "may [also] consider the RICO case statement in assessing whether plaintiff['s] RICO claims should be dismissed." Glessner v. Kenny,  952 F.2d 702, 712 (3rd Cir. 1991).

**II.     Rule 9(b) Standard.**[4]

Mirroring the standard set forth above, Federal Rule of Civil Procedure 8(a)(2) requires that "a pleading that states a claim for relief must contain . . . a short and plain statement of the claim showing that the pleader is entitled to relief."  This standard "does not require 'detailed factual allegations,' but it demands more than an unadorned,

---

[4]"A dismissal for failure to plead fraud with particularity under Rule 9(b) is treated as a dismissal for failure to state a claim under Rule 12(b)(6)."  U.S. ex rel. Grubbs v. Kanneganti, 565 F.3d 180, 185 (5th Cir. 2009).

the-defendant-unlawfully-harmed-me accusation."  <u>Ashcroft v. Iqbal</u>, ⎯ U.S.⎯ at ⎯,

129 S.Ct. 1937, 1949 (2009), quoting <u>Twombly</u>, 550 U.S. 544, 127 S.Ct. 1955.  A pleading

that offers labels and conclusions or a formulated recitation of the elements of a cause of

action will not do, nor will a complaint suffice if it tenders naked assertions devoid of further

factual enhancement.  <u>See Iqbal</u>, ⎯ U.S. at ⎯, 129 S.Ct. at 1949.

> Competing with Rule 8's demand for brevity is Rule 9(b), which provides:

> In alleging fraud or mistake, a party must state with particularity the
> circumstances constituting fraud or mistake.  Malice, intent, knowledge, and
> other conditions of a person's mind may be alleged generally.

F.R.C.P. 9(b).  Rule 9(b) applies to RICO claims resting on allegations of fraud.  <u>See</u>

<u>Williams v. WMX Technologies, Inc.</u>, 112 F.3d 175, 177 (5th Cir.1997).  "[T] he Rule 9(b)

standards require specificity as to the statements (or omissions) considered to be

fraudulent, the speaker, when and why the statements were made, and an explanation why

they are fraudulent."  <u>Plotkin v. IP Axess Inc.</u>, 407 F.3d 690, 696 (5th Cir.2005); <u>see also</u>

<u>Campa v. Nationwide Property & Casualty Ins. Co.</u>, No. 10-2707, 2010 WL 3733469, at *1

(S.D.Tex. Sept. 7, 2010) ("Essentially, the standard requires the complaint to allege

answers to 'newspaper questions' (who, what, when, where, and how) of the alleged

fraud.").  However, when ruling on a motion to dismiss based on Rule 9(b), courts are

"merely to assess the feasibility of the complaint, not to assay the weight of the evidence

which might be drawn in support thereof."  <u>Blythe v. Deutsche Bank</u>, 282 F.Supp.2d 1032,

1075 (D.Minn. 2003).

## III.    RICO Claims.

> Plaintiffs allege Cargill violated 18 U.S.C. § 1962(c), which provides:

> It shall be unlawful for any person employed by or associated with any
> enterprise engaged in, or the activities of which affect, interstate or foreign

commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity . . . .

18 U.S.C. § 1962(c); see also Record Document 251 at ¶ 12.  To state a claim under this section, a plaintiff must allege:  (1) the conduct; (2) of an enterprise; (3) through a pattern; (4) of racketeering activity.  See Elliott v. Foufas, 867 F.2d 877, 880 (5th Cir. 1989).  "This outline is deceptively simple, however, since each concept is a term of art which carries its own inherent requirements of particularity."  Id.

In the instant motion, Cargill argues that Plaintiffs assert no cognizable claims under RICO on multiple grounds: (1) failure to allege the identity of an enterprise distinct from Cargill; (2) failure to allege a qualifying association-in-fact; (3) lack of causation; and (4) the newly alleged predicate act of witness intimidation is neither legally cognizable nor factually plausible.

### A.    Distinctness between RICO Person and RICO Enterprise.

Section 1962 speaks of RICO persons and a RICO enterprise.  See TransFirst Holdings, Inc. v. Phillips, No. 06-2303,  2007 WL 1468553, *3 (N.D.Tex. May 18, 2007). The RICO person is the defendant while the RICO enterprise can be either a legal entity or an association-in-fact.  See St. Paul Mercury Ins. Co. v. Williamson, 224 F.3d 425, 440 (5th Cir. 2000).  "The [RICO] defendant who commits the predicate offenses must also be *distinct* from the enterprise."  Elliott, 867 F.2d at 881 (emphasis added).  "[A] corporate defendant [can] simultaneously be a RICO person and a member of an association-in-fact enterprise (along with other corporations or individuals) . . . because the association-in-fact is an entity that is distinct from the corporation itself."  TransFirst Holdings, Inc., 2007 WL 1468553, *4.

In this matter, Plaintiffs allege that the RICO person is Cargill and the RICO enterprise is an association-in-fact involving Cargill, CAN Technologies, Inc., David Cieslak, various mills controlled by Cargill, and others.  See Record Document 251 at ¶ 12; Record Document 256 at ¶ 2.   Cargill moves to dismiss Plaintiffs' claims under Section 1962 because it asserts that Plaintiffs have failed to allege the RICO person and the RICO enterprise are distinct. More specifically, Cargill argues that "Plaintiffs cannot prosecute their product liability claims through civil RICO by alleging that Cargill racketeered with components and employees of itself in conducting its day-to-day dairy feed business." Record Document 268 at 10-11.  Cargill contends that Plaintiffs' RICO claims must fail because their "entire RICO theory is that Cargill conducted or participated in the conduct of its own affairs."  Id. at 11.  Cargill grounds much of its argument in St. Paul Mercury Ins. Co. v. Williamson, 224 F.3d 425 (5th Cir. 2000), wherein the Fifth Circuit noted:

> To get around having a corporation named as both a RICO defendant and a RICO enterprise, many plaintiffs have charged the corporation as being part of an association-in-fact enterprise and also as a RICO defendant. Courts have roundly criticized this formulation.

Id. at 447.

In response to Cargill's motion, Plaintiffs relied heavily upon In re MasterCard Intern. Inc., Internet Gambling Litigation, 132 F.Supp.2d 468, 491 (E.D.La. 2001), which this Court has found to be persuasive.   In MasterCard, plaintiff Lawrence Bradley named as defendants Visa International and Travelers Bank and described the enterprise as consisting of "the Internet casino(s), Visa and Travelers."   Id.  Plaintiff Larry Thompson named as defendants MasterCard and Fleet while describing the enterprise as "the Internet casino(s), MasterCard and Travelers."  Id.  The court reasoned:

> Insofar as plaintiffs have alleged the existence of particular casinos in the body of their respective complaints who are not named as defendants, the Court concludes that for the purposes of these [Rule 12(b)(6)] motions, the RICO enterprise and the RICO defendants are distinct.

Id.   In reaching this conclusion, the court considered and addressed the "general dissatisfaction" expressed in the St. Paul case:

> Of course [St. Paul] was decided in the context of a group of individuals named as both RICO persons and the RICO enterprise.  In the case before this Court, it is corporations who are named as RICO persons and part of the RICO enterprise.  However, each defendant corporation is sued for its actions as a "position player" in the "team" enterprise. The RICO persons are not identical in name or function to the alleged enterprise.  The defendants are not the entire association in fact enterprise and can be named as defendants under [St. Paul].[FN8]
>
> . . .
>
> > FN8. . . .  This Court recognizes the criticism, but finds that under the law as it exists, plaintiffs have properly alleged the distinctness requirement. However, concerns that corporations will be vilified for merely "conducting their normal affairs" is generally unwarranted as those corporations will be shielded by the "operation or management" prerequisite to § 1962(c) liability.

Id. at 492 -493.

Applying the aforementioned rationale to the case at hand, the Court notes that Plaintiffs have alleged, in both the body of the Fourth Amended Complaint and in the RICO Case Statement, the existence an association-in-fact including not only Cargill, but also CAN Technologies, Inc., David Cieslak, and various other feed mills that produced the pellets.  See Record Document 251 at ¶ 12; Record Document 256 at ¶ 2.  These entities and single individual are not named as RICO defendants and Plaintiffs have alleged that the RICO person/defendant is not identical in name or function to the alleged enterprise.  Accordingly, at this stage of the litigation wherein all well-pled factual allegations in the

complaint must be accepted as true and construed in the light most favorable to Plaintiffs, the Court concludes that the RICO enterprise and the RICO person/defendant are distinct.

## B.    Association-In-Fact RICO Enterprise.

"An association-in-fact enterprise (1) must have an existence separate and apart from the pattern of racketeering, (2) must be an ongoing organization and (3) its members must function as a continuing unit as shown by a hierarchical or consensual decision making structure." Delta Truck & Tractor, Inc. v. J.I. Case Co., 855 F.2d 241, 243 (5th Cir. 1988).  Here, Cargill seeks dismissal of Plaintiffs' RICO claims, arguing that Plaintiffs have failed to allege facts sufficient to satisfy prongs one and two of the aforementioned test.

## Existence Separate and Apart from the Pattern of Racketeering

As to the first prong, "[w]hen the relationship between members of an alleged enterprise does not exist for purposes other than simply to commit the predicate acts and reap the resultant rewards, this requirement is not met." Young v. Scruggs, No. 09-669, 2010 WL 2301641, *7 (S.D.Miss. June 7, 2010).  In Boyle v. U.S., — U.S. —, 129 S.Ct. 2237 (2009), the Supreme Court granted certiorari to determine "whether an association-in-fact enterprise must have an ascertainable structure beyond that inherent in the pattern of racketeering activity in which it engages." Id. at 2244.  The Court broke that question into three parts:

> First, must an association-in-fact enterprise have a "structure"?   Second, must the structure be "ascertainable"? Third, must the "structure" go "beyond that inherent in the pattern of racketeering activity' in which its members engage?"

Id.  As to the third question, the Court explained that the phrase "beyond that inherent in the pattern of racketeering activity" can be interpreted in least two different ways:

> If the phrase is interpreted to mean that the existence of an enterprise is a separate element that must be proved, it is of course correct.  As we explained in <u>Turkette</u>, the existence of an enterprise is an element distinct from the pattern of racketeering activity and "proof of one does not necessarily establish the other."
>
> On the other hand, if the phrase is used to mean that the existence of an enterprise may never be inferred from the evidence showing that persons associated with the enterprise engaged in a pattern of racketeering activity, it is incorrect.  We recognized in <u>Turkette</u> that the evidence used to prove the pattern of racketeering activity and the evidence establishing an enterprise "may in particular cases coalesce."

<u>Id.</u> at 2245.

In their RICO Case Statement, Plaintiffs alleged that the pattern of racketeering activity, consisting of the mail and wire communications and witness intimidation, is separate from the enterprise itself. <u>See</u> Record Document 256 at ¶ 7.  Plaintiffs were then asked to describe the alleged relationship between the activities of the enterprise and the pattern of racketeering activity.  <u>See id.</u> at ¶ 8.  They were also asked to discuss how the racketeering activity differs from the usual and daily activities of the enterprise, if at all.  <u>See id.</u>  Plaintiffs responded:

> All of the members of the enterprise engage in other activity, not directly related to the enterprise, on a regular basis.  Cargill . . . is a mammoth corporation for which the dairy nutrition business is a relatively small part of its overall worldwide operations.  CAN Technologies, Inc. also engages in legitimate research and technology on a regular basis. The various mills controlled by Cargill produce many other presumedly legitimate products in addition to the dairy pellets that constitute the object of this scheme.  Dave Cieslak presumedly oversees legitimate operations of Cargill and CAN Technologies, Inc. in addition to his role as a member of the enterprise executing this fraudulent scheme.  The pattern of racketeering activity is directed at accomplishing the needs of the enterprise to execute the scheme to defraud described above.

<u>Id.</u>

At this stage of the case, the Court finds that Plaintiffs have plead sufficient facts in their RICO Case Statement to establish that the association-in-fact enterprise has an

existence separate and apart from the pattern of racketeering.  At a minimum, the facts plead regarding the connectivity of the members of the association-in-fact and their legitimate business operations can fairly give rise to the type of inference contemplated in Boyle, that is "the evidence used to prove the pattern of racketeering activity and the evidence establishing an enterprise may in particular cases coalesce."  Boyle, 129 S.Ct. at 2245.

**Continuity**

"A RICO association-in-fact enterprise must be shown to have continuity." Calcasieu Marine Nat. Bank v. Grant, 943 F.2d 1453, 1461 (5th Cir. 1991).  Such continuity, i.e., the ongoing nature of an association-in-fact, is the linchpin of enterprise status.  See id. at 1462.  "The enterprise must have continuity of its structure and personnel, which links the defendants, and a common or shared purpose."  Id.

In H.J. Inc. v. Northwestern Bell Telephone Co., 492 U.S. 229, 109 S.Ct. 2893 (1989), the Supreme Court explained that continuity is "centrally a temporal concept" that may be closed-ended or open-ended, "referring either to a closed period of repeated conduct, or to past conduct that by its nature projects into the future with a threat of repetition."  Id. at 241-242, 109 S.Ct. at 2902.

Cargill further contends that Plaintiffs' RICO claims should fail on the independent ground that the alleged association-in-fact enterprise is not a continuing unit.  Specifically, Cargill argues that Plaintiffs have failed to demonstrate a continuity of the "structure and personnel" of the enterprise that links it to a common or shared purpose and that Plaintiffs have alleged no behavior demonstrating that the association-in-fact is a continuous ongoing enterprise.  See Record Document 257-1 at 11.

A review of the Fourth Amended Complaint and the RICO Case Statement show that the enterprise plead in this matter satisfies the continuity requirement, namely the  threat of continued racketeering activity, required under RICO.  Plaintiffs have identified predicate acts directed at approximately 40 named plaintiffs.  <u>See</u> Record Document 256 at ¶ 5.  Plaintiffs also alleged that the fraudulent scheme began in 2001 and has continued through the present affecting dairies in all 50 states.  <u>See id.</u>  This is sufficient to state a claim to relief under RICO that is plausible on its face because Plaintiffs have plead facts "showing that the predicate acts or offenses are part of an ongoing entity's regular way of doing business."  <u>Id.</u> at 242, 109 S.Ct. at 2902.  Further, the Court once again notes that  this is a case wherein the evidence used to prove the pattern of racketeering activity and the evidence used to establish an enterprise that has continuity of structure and personnel is likely to coalesce.  <u>See Boyle</u>, 129 S.Ct. at 2245.

### C.    Causation.

Cargill argues that Plaintiffs' RICO theory lacks a causal link between the alleged predicate acts and the alleged damages, which is necessary for standing under RICO.  <u>See</u> Record Document 257-1 at 12.  "[A] plaintiff may sue for treble damages under the RICO statute only if he has suffered injury to his business or property ***by reason of a*** violation of section 1962."  <u>Ocean Energy II, Inc. v. Alexander & Alexander, Inc.</u>, 868 F.2d 740, 743 (5th Cir. 1989), citing 18 U.S.C. § 1964(c) (emphasis added).

In <u>Hemi Group, LLC v. City of New York, N.Y.</u>, — U.S. —, 130 S.Ct. 983 (2010), the Supreme Court gave its latest instruction on proximate causation relating to the RICO statute.  In doing so, the Supreme Court also outlined two of its previous cases, <u>Holmes v. Securities Investor Protections Corporation</u>, 503 U.S. 258, 112 S.Ct. 1311 (1992), and

Anza v. Ideal Steel Supply Corporation, 547 U.S. 451, 126 S.Ct. 1991 (2006), which also

provided guidance on the issue of proximate causation:

> In Holmes . . . , we set forth the standard of causation that applies to civil RICO claims. . . .  The Court held that SIPC could not recover against the conspirators because it could not establish that it was injured by reason of the alleged fraud, as that phrase is used in RICO.

> We explained that, to state a claim under civil RICO, the plaintiff is required to show that a RICO predicate offense not only was a but for cause of his injury, but was the proximate cause as well.  Proximate cause for RICO purposes, we made clear, should be evaluated in light of its common-law foundations; proximate cause thus requires *some direct relation between the injury asserted and the injurious conduct alleged.  A link that is too remote, purely contingent, or indirect is insufficient.*

> Applying that standard, we rejected SIPC's RICO claim. The alleged conspiracy, we held, directly harmed only the broker-dealers; SIPC's injury, on the other hand, was *purely contingent* on that harm.  The connection between the alleged conspiracy and SIPC's injury was therefore too remote to satisfy RICO's direct relationship requirement.

> . . .

> But as we reiterated in Holmes, the general tendency of the law, in regard to damages at least, is not to go beyond the first step.  Our cases confirm that the general tendency applies with full force to proximate cause inquiries under RICO.  Because the City's theory of causation requires us to move well beyond the first step, that theory cannot meet RICO's direct relationship requirement.

> Our decision in Anza, supra, confirms that the City's theory of causation is far too indirect.

> . . .

> Finding the link between the fraud alleged and injury suffered to be attenuated, we rejected Ideal's claim.  The ***direct victim*** of this conduct, we held, was the State of New York, not Ideal.  It was the State that was being defrauded and the State that lost tax revenue as a result.  We recognized that Ideal had asserted its own harms when National failed to charge customers for the applicable sales tax.  But the cause of Ideal's harm was a set of actions (offering lower prices) entirely distinct from the alleged RICO violation (defrauding the State).  The alleged violation therefore had not led

directly to the plaintiff's injuries, and Ideal accordingly had failed to meet RICO's requirement of a direct causal connection between the predicate offense and the alleged harm.

. . .

The City's theory thus requires that we extend RICO liability to situations where the defendant's fraud on the third party (the State) has made it easier for a fourth party (the taxpayer) to cause harm to the plaintiff (the City).

Hemi Group, LLC, 130 S.Ct. at 988-990 (internal citations and quotations omitted) (emphasis added).  The Supreme Court noted that "one consideration we have highlighted as relevant to the RICO direct relationship requirement is ***whether better situated plaintiffs would have an incentive to sue***."  Id. at 990 (emphasis added).

While proximate causation presents a challenging and at this stage a close issue, the Court finds that proximate causation under the RICO statute is sufficiently supported by Plaintiffs' factual allegations.  In the Fourth Amended Complaint, Plaintiffs alleged that the changes in the composition of the dairy feed pellets substitute ingredients that were not nutritionally equivalent caused detriment to the general health of the cows and specifically caused loss of milk production, impaired reproduction, increased mortality and illness.  See Record Document 251 at ¶ 7.  In their RICO Case Statement, Plaintiffs stated:

The named plaintiffs and absent class members are all victims of the scheme and are injured by the decrease in milk production of their herds, the decrease in reproduction of their herds, the increase in sickness and attendant healthcare costs, the decrease in productive life of the dairy cows, and the increase in their mortality.  Some of the victims were damaged to the extent that their dairies were forced to close or seek bankruptcy protection.

. . .

The injury is to the business and property of the dairy farmers who make up the class.  Because of the detrimental features of the Cargill dairy pellets described above, the business of the farmers is damaged by reduced milk production and damage to the health and reproduction of the dairy cows.

> The damage to the cows is also property damage.  The farmers are also damaged by not receiving, despite their payments, the feed that they thought they were buying.

Record Document 256 at ¶¶ 4, 15.

Based on these factual allegations, Plaintiffs are the direct victims of the fraudulent scheme and appear to be best situated to sue. Hemi Group, LLC, 130 S.Ct. at 990.  This case does not call for RICO liability to be extended to a situation where "the defendant's fraud on the third party . . . has made it easier for a fourth party . . . to cause harm to the plaintiff." Id.  Rather, this is an instance where the RICO defendant is alleged to have caused the Plaintiffs' injuries and not a case involving plaintiffs who are only derivative victims. See Treadway v. Lisotta, No. 08-1375, 2008 WL 3850462, *4 (E.D. La. Aug. 15, 2008).  The facts plead state a claim for injuries that are more than "tenuously related to the RICO violation at issue." Id.  And while it is true that Plaintiffs' claimed injuries relating to decrease in milk production of their herds, the decrease in reproduction of their herds, the increase in sickness and attendant healthcare costs, and the decrease in productive life of the dairy cows could have resulted from factors other than Cargill's alleged acts of fraud, the undersigned believes that this argument is better suited to be addressed at a later stage in the litigation. See Anza, 547 U.S. at 459, 126 S.Ct. at 1997.

> **D.    Witness Intimidation/Tampering.**

"Racketeering activity consists of no more and no less than commission of a predicate act." Sedima, S.P.R.L. v. Imrex Co., Inc., 473 U.S. 479, 495, 105 S.Ct. 3275, 3284 (1985), citing 18 U.S.C. § 1961(1).  Section 1961(1) sets forth an exhaustive list of predicate offenses, including bribery, embezzlement, mail fraud, wire fraud, financial institution fraud, and witness tampering. See 18 USC § 1961(1).

Here, Plaintiffs allege three predicate acts:  mail fraud, wire fraud, and intimidation of a witness.  <u>See</u> Record Document 256 at ¶ 5.  As to the third predicate act, Plaintiffs contend that Cargill intimidated former employees to influence their testimony regarding their knowledge of the scheme to defraud the dairy customers, all in violation of 18 U.S.C. §1512(b)(1) and (b)(2)(A).[5]  <u>See id.</u>  More specifically, Plaintiffs allege:

> Beginning in February and March of 2007, Cargill, ***acting through its various outside law firms, as well as through its senior management***, set out to intimidate Todd Schwegel, a dairy nutritionist formerly employed by Cargill in its Pacific Coast division as a dairy management consultant. Cargill filed a lawsuit on March 1, 2007, containing objectively specious claims against Schwegel and others whom it knew had knowledge of this scheme and obtained a TRO seizing all of their computers and communication devices.  By this tactic, Cargill intimidated Schwegel into signing a confidential settlement agreement in late March 2007 requiring him to pay Cargill the sum of one million dollars if he violated a non-disparagement clause in the agreement.  In accordance with what he felt were the requirements of his settlement agreement with Cargill, Schwegel has provided testimony for Cargill in furtherance of the scheme.

<u>Id.</u> (emphasis added).  In the Fourth Amended Complaint, Plaintiffs allege:

> The enterprise relies upon the efforts of its members, aided by various outside law firms, to intimidate any employees who leave the employ of Cargill to prevent them from revealing any knowledge they may possess

---

[5]Section 1512(b) provides:

Whoever knowingly uses intimidation, threatens, or corruptly persuades another person, or attempts to do so, or engages in misleading conduct toward another person, with intent to –

(1)    influence, delay, or prevent the testimony of any person in an official proceeding;

(2)    cause or induce any person to –

    (A)    withhold testimony, or withhold a record, document, or other object, from an official proceeding . . .

shall be fined under this title or imprisoned not more than 20 years, or both.

> concerning the scheme, by threatening to enforce broadly worded confidentiality agreements required of employees and by commencing baseless litigation against former employees who do not agree to conceal the scheme, including the assertion of specious claims that the dairy feed formulas and the software programs used to devise them are trade secrets. Cargill also pressures former employees, such as Todd Schwegel, to join in these efforts.

Record Document 251 at ¶ 12.

Cargill argues that Plaintiffs have not adequately plead the predicate act of witness tampering under Section 1512. See Record Document 257-1 at 14-17. Conversely, relying solely upon Section 1512(b)(1),[6] Plaintiffs contend that they "have pleaded and will prove at trial that Cargill used acts of intimidation against former employees to conceal the RICO enterprise's fraud scheme." Record Document 269 at 36. Yet, Plaintiffs concede that "it ultimately makes little difference to the progress of this litigation whether the acts of intimidation are characterized as a separate predicate act of witness tampering under Section 1512, or merely actions taken in furtherance of the mail and wire fraud scheme." Id.

Cargill's primary argument is that "a federal court's entry of a TRO and a settlement-backed Consent Decree yields no crime of witness tampering." Record Document 268 at 15. While it is true that "legitimate acts of attorneys on behalf of clients cannot form the basis of a RICO claim," Plaintiffs have alleged acts on the part of not only various outside law firms, but also Cargill's senior management. See Morin v. Trupin, 711 F.Supp. at 97, 105-106 (S.D.N.Y. 1989). Moreover, Plaintiffs not only reference baseless lawsuits, but also threats to enforce broadly worded confidentiality agreements and pressures for fomer

---

[6]Plaintiffs appear to have abandoned their reliance on Section 1512(b)(2), which relates to the withholding of testimony in an official proceeding.

employees to join in the alleged intimidation efforts.  Again, accepting all well-pled factual allegations in the complaint as true and construing them in the light most favorable to Plaintiffs, the Court finds that the factual allegations in the RICO Case Statement and the Fourth Amended Complaint are sufficient to allege a violation of Section 1512(b)(1) – that Cargill "knowingly use[d] intimidation . . . with intent to . . . influence . . . the testimony of [a] person in an official proceeding."

**IV.     Rule 9(b) Argument Relating to RICO and Fraud Claims.**

Cargill seeks dismissal of Plaintiffs' RICO and fraud claims under Rule 9(b), which provides, in pertinent part:

> In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake.

F.R.C.P. 9(b).  As to the fraud claims, Cargill seeks dismissal of Plaintiffs' on the ground that the fraud allegations "provide nothing more than conclusory assertions of wrongdoing." Record Document 257-1 at 18.  "At a minimum, Plaintiffs impermissibly fail to allege *who* made any of the misrepresentations, *who* heard any of the statements, *what* were any of the "misrepresentations of fact" about the pellets, *when* any of the statements were made, and *where* any of the statements were made."  Record Document 257-1 at 19.

The Court disagrees, noting that "Rule 9(b) does not negate the simplicity and flexibility contemplated by Rule 8, and it would be error to focus on Rule 9(b)'s particularity requirement in a vacuum."  In re Catfish Antitrust Litigation, 826 F.Supp. 1019, 1029 (N.D.Miss. 1993).  "Rule 9(b) requires that the circumstances of fraud be pled with enough particularity to put the party on notice as to the nature of the claim," such that the defendant may prepare a responsive pleading. Id. Here, Plaintiffs have alleged that Cargill's conduct constituted fraud, "in that [it] made material misrepresentations of fact as to the composition

and fitness of its pellets, knowing the misrepresentations to be untrue, for the purpose of inducing [Plaintiffs] to reply upon the misrepresentations." Record Document 251 at ¶ 10. This fraudulent scheme also forms the basis of Plaintiffs' RICO claims and is set out in great detail in Plaintiffs' RICO Case Statement. See generally Record Document 256. The RICO Case Statement alleges that the fraudulent misrepresentations and omissions were made by Cargill nutritionists and salesmen at the initial meetings with the dairy farmers and where then repeated whenever the issue arose again. See id. at ¶ 5(c). Plaintiffs have specifically identified Mack Reed as the salesman for the lead plaintiff, Dr. John Burford. See id. Likewise, Plaintiffs have outlined their "reformulation" allegations in great detail in the RICO Case Statement. See id. These facts are sufficient to put Cargill on notice as to the nature of the fraud claims.[7]

Cargill also argues that Plaintiffs do not provide the detail of fraud required for their RICO claims. See Record Document 257-1 at 20. "Cargill has not be fairly apprised of the who, when, what, and where basics of any of Plaintiffs' mail and wire fraud allegations." Id. Plaintiffs only provide generalized allegations. See id. at 20-21. Again, for the reasons previously stated, the Court finds that the RICO Case Statement contains sufficient "time, place and contents" allegations. See Record Document 256 at ¶ 5; see also Giuliano v. Everything Yogurt, Inc., 819 F.Supp. 240, 244 (E.D.N.Y. 1993) ("[T]he complaint need not specify the time, place and content of each mail communication where the nature and

---

[7]The Court further notes that this case implicates "corporate or business fraud," such that Plaintiffs "cannot be expected to have knowledge of all the details which undergird the alleged fraudulent scheme." In re Catfish Antitrust Litigation, 826 F.Supp. at 1029. In such cases, "some relaxation of Rule 9(b)'s particularity requirement is appropriate in instances where such information is in the defendant's hands or control." Id. This relaxed rule is especially applicable in the early stages of litigation where pleadings are filed before the commencement of discovery. See id. at 1029-1030.

mechanics of the underlying scheme is sufficiently detailed, and it is enough to plead the general content of the misrepresentation without stating the exact words used, especially where the information is exclusively in the possession of the defendants.  Furthermore, a motion to dismiss under Rule 9(b) will be denied if the pleading contains some allegations of fraud.").

The Court further notes that this is a case where Plaintiffs have alleged that the mail fraud and wire fraud were used in the furtherance of the master scheme to defraud.  They have alleged that the mailings are an essential part of the scheme to defraud because they "are the mechanism by which Cargill collects its payment for the feed."  See Record Document 256 at ¶ 5.  Cargill mails invoices to its dairy customers on a monthly basis and receives their payments by mail, as well.  See id.  There have been tens of thousands of mailings to the class members dating back to 2001 and continuing to the present.  See id. Plaintiffs have alleged that the wire communications involve "emails and other wire communications between the reformulations coordinators for Cargill and the managers of the various feed mills where the dairy pellets are manufactured for Cargill."  See id.  "These communications are essential to the scheme because they are the manner by which the mill managers inform the reformulators of the availability of the by-products and other substitute ingredients and the manner by which the Cargill reformulators send back the new formulas after running the BILLS software owned by CAN Technologies, Inc."  Id.  These reformulations occur as often as weekly and "also number in the tens of thousands over the course of the time frame at issue in this case, from 2001 to present."  Id.  These factual allegations demonstrate "that the mails or wires were simply used in furtherance of a master plan to defraud" and the mail and wire communications did not necessarily contain

false or misleading information themselves. <u>In re Sumitomo Copper Litigation</u>, 995 F.Supp. 451, 456 (S.D.N.Y. 1998).  "In such cases, a detailed description of the underlying scheme and the connection therewith of the mail and/or wire communications is sufficient to satisfy Rule 9(b)." <u>Id.</u>

## CONCLUSION

Based on the foregoing analysis, Cargill's Motion to Dismiss (Record Document 257) is **DENIED**.  The Court finds that Plaintiffs have adequately plead the identity of an enterprise distinct from Cargill; a qualifying association-in-fact; proximate causation; and the predicate act of witness intimidation.  Moreover, Plaintiffs, in their Fourth Amended Complaint and the RICO Case Statement, have plead the circumstances of fraud with enough particularity to put Cargill on notice as to the nature of the RICO and fraud claims.

**THUS DONE AND SIGNED**, in Shreveport, Louisiana, this the 20th day of September, 2011.

S. MAURICE HICKS, JR.
UNITED STATES DISTRICT JUDGE