UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
SHREVEPORT DIVISION

| | |
|---|---|
| JOHN BURFORD, ET AL. | CIVIL ACTION NO. 05-0283 |
| VERSUS | JUDGE S. MAURICE HICKS, JR. |
| CARGILL, INCORPORATED | MAGISTRATE JUDGE HORNSBY |

# Special Master's Report and Recommendations

## I.   The parties settled the case.

John Burford filed this suit on December 21, 2004 against Cargill, Incorporated.[1]  Burford, a dairy farmer, alleged that his cows had ingested defective customized dairy feed that Cargill had manufactured.  Cargill subsequently removed the suit to this Court.[2]

In early 2012, the parties sought to resolve the dispute, and they asked the Court to approve a class settlement.  On June 4, 2012, the Court conditionally certified the class.[3]  In so doing, the Court appointed the undersigned as Special Master with the assignment of overseeing the settlement administration.

---

[1] Rec. Doc. 1 (Petition for Damages).

[2] Rec. Doc. 3 (Notice of Removal).

[3] Rec. Doc. 323 (Order Conditionally Certifying the Settlement Class; Preliminarily Approving the Proposed Settlement; Appointing the Special Master, CADA, and Escrow Agent; Appointing Plaintiffs' Counsel as Class Counsel; Approving the Form and Manner of Notice to the Settlement Class Members; and Scheduling a Fairness Hearing).

No one objected to the settlement.[4] This Court conducted a fairness hearing on November 7, 2012.[5] The Court polled the courtroom for objections at that time, and no one raised an objection. The Court received evidence and argument, and subsequently issued a final judgment approving the class settlement.[6] No one has filed post-trial motions or appeals challenging the Court's judgment.

## II.   The Special Master and the CADA processed claims.

### A.   The process afforded claimants a chance to cure deficiencies.

The CADA, coordinating with and under the direction of the Special Master, reviewed each claim that it received. If the claim provided the appropriate information, the CADA evaluated it to determine whether it identified tonnage of feed that warranted recovery pursuant to the terms of the settlement (and, if so, how much). If the information provided by the claim was deficient (i.e., if the claim failed to provide some requested information), the CADA gave the claimant a chance to cure the deficiency. In such cases, the CADA mailed each claimant a letter stating both the deficiency and the time allotted to cure the deficiency as outlined in the Stipulation and Agreement of Settlement.[7] Claimants who failed to cure deficiencies before time expired were issued allocation letters stating that their claims were invalid due to material deficiencies, and further stating that the claimants would receive no settlement awards. In accordance with Section III.9.1 of the Stipulation and Agreement of Settlement, claimants were given an opportunity to object to any decisions.

---

[4]Rec. Doc. 332 (Special Master's Report).

[5]Rec. Doc. 337 (Minutes of Court).

[6]Rec. Doc. 339 (Final Order and Judgment); and Rec. Doc. 341 (Judgment).

[7]Rec. Doc. 314-1 (Stipulation and Agreement of Settlement § 8.4).

### B.     The Special Master and the CADA reviewed untimely claims.

The deadline to file claims expired on September 14, 2012.[8]  Nevertheless, the Special Master and the CADA received numerous claims since that date.  All claims received after the claims deadline were initially classified as late and invalid.  At the direction of the Special Master, the CADA, with assistance from Cargill, reviewed each late claim to determine the following:

1.     Whether or not the claimant was mailed a notice packet,

2.     If the claimant was mailed a notice packet, whether or not there was returned mail, and

3.     If the claimant was not mailed a notice packet, whether or not the claimant should have received a notice packet.

Late claims were processed according to the guidelines in the Stipulation and Agreement of Settlement.  As was the case with timely claims, claimants were given an opportunity to object to the decision and provide documentation in support of their objection, in accordance with Section III.9.1 of the Stipulation and Agreement of Settlement.

Although the Fifth Circuit has not directly addressed the issue, other circuits have held that late claimants should be allowed to share in a class settlement if they satisfy an "excusable neglect" standard.[9]  The Special Master invited late claimants to make individualized (as opposed to form) written submissions explaining why they did not comply with the September 14, 2012 deadline, including how and when they found out about the class action and how quickly they responded when they found out.

---

[8] Rec. Doc. 314-1 (Stipulation and Agreement of Settlement § 1.6).

[9] See, e.g., *In re Orthopedic Bone Screw Prods. Liab. Litig.*, 246 F.3d 315, 321-23 (3rd Cir. 2001).

The Special Master reviewed each of the submissions by late claimants. If the Special Master determined that a late claimant satisfied the excusable neglect standard, he directed the CADA to allocate a recovery to the claimant according to the Stipulation and Agreement of Settlement. If the Special Master determined that the late claimant did not satisfy the excusable neglect standard, he informed the CADA of this decision and asked the CADA to include the reason for the decision on the spreadsheet attached hereto as Exhibit 1[10] (with the late claimant's recourse, if any, being an objection or appeal to this Court). If the Special Master determined that a factual issue remained that was not resolved by the written submissions, he offered the late claimant a telephone evidentiary hearing. As will be discussed below, the Special Master offered similar hearing to timely claimants when appropriate.

### C.   The Special Master and the CADA issued preliminary allocation letters and consider objections.

All claimants were issued allocation letters that provided their status in the case and estimated recovery awards (if applicable). All claimants were given an opportunity to submit a written objection to either (a) the overall allocation amount or (b) an "invalid" status that resulted in a zero dollar allocation. Late claimants were charged with the responsibility of providing a reason for "excusable neglect" in failing to submit a timely claim. In accordance with Section III.9.1 of the Stipulation and Agreement of Settlement, claimants were given an objection deadline of 30 days from the time that allocation letters were distributed. The Special Master personally evaluated all

---

[10] Exhibit 1 (Final Invalid Claimant List is filed under seal in accordance with Rec. Doc. 314-1, Stipulation and Agreement of Settlement)

objections.

The Special Master subsequently determined that most outstanding objections could be determined (whether favorably or unfavorably) based upon the written submissions. The Special Master did, however, conclude that testimonial evidence might be helpful in determining certain claims (as was the case with some late claimants who alleged excusable neglect). To this end, he directed the CADA to contact these claimants to determine whether they desired a hearing.

Eventually, the Special Master conducted five telephone hearings on May 23, 2013: Brad Thomas, Country Ayre Farms, Allen Weller, Edsel Beck, and Fagundes Dairy. The Special Master is now prepared to make the following recommendations as to those five claimants.

### Brad Thomas

Question 7 of the claim form asked for the time period of the claimant's "dissatisfaction or harm." Mr. Thomas's claim form stated that this time period was 2008 to 2009. Nevertheless, he testified at the hearing that he made a mistake, and that the time period should have been from 2001 through March 2009. He produced invoices to support his revised claim. Cargill's counsel confirmed that Mr. Thomas's revised claim appeared to be in the "accurate ballpark of what he purchased."

The Special Master recommends that Mr. Thomas's award be adjusted as is reflected in the spreadsheet which is attached as Exhibit 2.[11]

---

[11] Exhibit 2 (Final Valid Claimant List is filed under seal in accordance with Rec. Doc. 314-1, Stipulation and Agreement of Settlement)

### Country Ayre Farms

Heather Woodis appeared on behalf of Country Ayre Farms. Country Ayre Farms filed claims for feed purchased in two states, New York and Massachusetts. Like Mr. Thomas, Ms. Woodis testified that she mistakenly filled in the time period in response to Question 7. In light of the testimony received at the evidentiary hearing, the Special Master is satisfied that Country Ayre Farms's award should be adjusted.

The Special Master recommends that Country Ayre Farms's award be adjusted as is reflected in the spreadsheet which is attached as Exhibit 2.

### Allen Weller

Mr. Weller did not argue that the CADA incorrectly implemented the terms of the Stipulation and Agreement of Settlement. Instead, he argued that the terms of the Stipulation and Agreement of Settlement were unfair. However, Mr. Weller did not timely object to the settlement or timely opt out.

The Special Master recommends that the Court adopt the CADA's award to Mr. Weller as reflected in Exhibit 2.

### Edsel Beck

Mr. Beck owned E&S dairy farm in Georgia beginning in the 1990s. He testified that he purchased feed from Southeast Dairy Co-op in Florida. Mr. Beck did not travel to Florida to purchase the feed; Southeast would send a dairy nutritionist to Georgia. Mr. Beck believes that the

nutritionist told him that it was Cargill feed, but he cannot remember the nutritionist's name: "Sir, that has been so long. There is no way in the world I could remember that."

The CADA's representative testified that Mr. Beck had provided invoices, but the invoices had no coding from Cargill. The CADA took the further step of directly contacting Southeast in Florida and spoke to the feed manager who stated that, to his knowledge, Southeast had never sold Cargill feed in the state of Florida. Cargill's business manager for the region could not locate any records to support Mr. Beck's claim and could not find anyone with a recollection of selling Mr. Beck or E&S Cargill feed. Furthermore, Cargill's counsel pointed out that not all Cargill feed qualifies pursuant to the settlement. Even if one accepts Mr. Beck's memory of what he was told by the dairy nutritionist (i.e., that he was purchasing Cargill feed), that alone would not be enough to qualify Mr. Beck for recovery.

The Special Master recommends that the Court adopt the CADA's denial of an award to Mr. Beck as reflected in Exhibit 1.

### Fagundes Dairy

Fagundes Dairy submitted its claim 34 days late. The Special Master concludes Fagundes did not satisfy the excusable neglect standard. Nevertheless, the Special Master will address the merits of the claim.

Glenn Guior of Financial Recovery Services appeared on behalf of Fagundes. Although Mr. Guior is a retired attorney, he stated that he was not appearing in the capacity of an attorney. He stated that Brad Samuelson of Fagundes was aware that Mr. Guior was participating in the telephone hearing.

Fagundes made three claims. One was for direct purchases from Cargill. The other two for indirect purchases (potentially from A.L. Gilbert & Sons and Associated Feed).

For the direct purchases, the CADA reviewed Cargill's sales history and database, but could not find any evidence of Fagundes's direct purchases. The CADA referred the matter to Cargill, which found purchases by Valley Calf Ranch (a Fagundes entity). However, as its name implies, Valley Calf Ranch apparently used calf feed (which is borne out by Cargill's records), which does not qualify for recovery under the settlement.

For indirect purchases, the CADA contacted the nutritionist at A.L. Gilbert & Sons and the vice-president at Associated Feed. The CADA confirmed that neither of those entities ever sold Cargill feed. Cargill made similar inquiries and was unable to find evidence of any indirect purchases.

When confronted with these statements from the CADA and Cargill, Mr. Guior conceded that their investigation was reasonable.

The Special Master recommends that the Court deny Fagundes's claims as is reflected in Exhibit 1.

## III. How should the CADA make out the checks?

As Exhibits 1 and 2 indicate, most claimants filed claims on their own behalf. If this Court approves the suggested awards, the CADA will name those claimants as the payees on their respective checks.

The CADA received many other claims (mostly late claims) through three intermediary entities: Financial Recovery Services (FRS) of South Hackensack, New Jersey; Johnson Recoveries,

LLC of North Oaks, Minnesota; and David Meyers of East Lansing, Michigan.

FRS typically would submit a claim form accompanied by a cover letter and an "Antitrust Settlement Contract."[12] Paragraph 3 of the Antitrust Settlement Contract states in part:

> In consideration of advising the Class Member of the settlement recovery opportunity and processing the Class Member's claims, Class Member agrees to pay FRS Thirty-three Percent (33%) of all proceeds received as payment for all claims filed pursuant to this agreement. Class Member agrees that any and all proceeds shall be paid directly to FRS by the claims administrator. FRS will deposit any and all proceeds into FRS's bank account, and disburse Class Member's recovery within thirty days less FRS's compensation described herein.

Furthermore, paragraph 4 of the Antitrust Settlement Contract states: "FRS is not Class Member's Attorney and is not practicing law."

For its part, Johnson Recoveries would submit a claim form accompanied by a cover letter and a "Limited Power of Attorney."[13] Similar to FRS's Antitrust Settlement Contract, Johnson Recoveries's Limited Power of Attorney directs the claims administrator to pay Johnson Recoveries rather than the claimant. The documents in the CADA's possession do not state what fee (if any) Johnson Recoveries expects to receive.

David Meyers would submit a claim form accompanied by a cover letter and a "Cargill Antitrust Settlement."[14] The Cargill Antitrust Agreement tracks the language of FRS's Antitrust Settlement Contract, except that it specified a fee of 20% rather than 33%.

Citing the above provisions, these entities have asked the CADA to issue checks to them

---

[12]Exhibit 3.

[13]Exhibit 4.

[14]Exhibit 5.

rather than to the claimants themselves. The CADA turned to the Special Master for guidance. The Special Master now turns to the Court.

As the Fifth Circuit has long recognized, a district court presiding over a class action has the inherent authority, and the duty, to protect the class. This authority extends to the district court's supervision over the amount and allocation of attorney's fees, as this Court recognized in its own Memorandum Order addressing the attorney's fees in this case.[15]

A good example of a court exercising its authority over fees is *Allapattah Servs. v. Exxon Corp.*[16] As the *Allapattah* court exhaustively sets forth, the court's authority to award fees does not arise from relationships among the attorneys, but from the court's inherent equitable powers:

> It is fundamental that the submission of a fee application in a federal court always implicates the court's equitable review function. This is especially true where counsel is seeking a percentage award of the common fund. . . . As further explained in the Fifth Circuit's . . . *Hoffert* decision, ". . . where, as here . . ., the plaintiff's attorney himself invokes the court's equitable power to approve a settlement agreement to distribute the proceeds,[17] the court must scrutinize the reasonableness of the contingent attorney's fee contract which affects the net recovery to the plaintiff." . . . This principle is even more obvious in the class action context . . . .[18]

The *Allapattah* court had to decide whether it was bound to enforce a fee allocation agreement

---

[15] Rec. Doc. 340 (Memorandum Order). See also *In re High Sulfur Content Gasoline Prods. Litig.*, 517 F.3d 220 (5th Cir. 2008) ("In a class action settlement, the district court has an independent duty under Federal Rule of Civil Procedure 23 to the class and the public to ensure that attorneys' fees are reasonable and divided up fairly among plaintiffs' counsel.").

[16] 454 F.Supp.2d 1185 (S.D. Fla. 2006).

[17] *Hoffert v. General Motors*, 656 F.2d 161, 164 (5th Cir. 1981). It should be remembered that the out-of-state lawyers invoked this Court's power by removing this case from state court.

[18] 454 F.Supp.2d at 1225.

among the lawyers. The court surveyed the jurisprudence throughout the nation, and decided to follow the majority view that "the distribution of fees in a fee allocation agreement must be in proportion to the services rendered."[19] The court refused to enforce the fee allocation agreement in that case because it

> would result in a grossly disproportionate award among the five law firms in relation to services actually rendered, and benefits bestowed on the class . . . . I conclude that an allocation of fees should be based on the relative contributions that each law firm provided to the Class. . . . I respectfully decline to enforce the 1996 Letter Agreement. Instead, I look to allocating the attorneys' fees in accordance with each firm's contribution during the various phases of the case.[20]

Ignoring the parties' agreement, the *Allapattah* court proceeded to determine "the relative contributions of the five law firms seeking an award of attorneys' fees. . . ."[21]

Of course, this Court already analyzed the reasonableness of the requested attorney's fees when it issued its Memorandum Order on November 8, 2012.[22] In that order, the Court approved a fee of $9,166,666.66, approximately one-third of the total settlement.

The Special Master suggests that the Court consider whether it should review the reasonableness of the additional assessments that FRS and Johnson Recovery seek to impose (up to 33% of the claimant's recovery). This issue is not novel. As the Manual for Complex Litigation states:

> The court and counsel should be alert to the possibility of persons

---

[19] *Id.* at 1225-26.

[20] *Id.* at 1227.

[21] *Id.*

[22] Rec. Doc. 340 (Memorandum Order).

Page 11 of 16

>soliciting class members after the settlement and offering to provide "collection services" for a percentage of the claims. Such activities might fraudulently deprive class members of benefits provided by the settlement and impinge on the court's responsibility to control fees in class actions.[23]

The Manual cites *Jack Faucett Assocs., Inc. v. American Tel. & Tel. Co.*[24] In that case, the parties entered into a class action settlement. A stranger to the litigation named Independent Consulting Services (ICS) entered into contracts with some of the class members "to take all steps necessary to apply for and collect settlement payments which are due Class members, including preparing, completing and filing claim forms for Class members."[25] In exchange for the service, the class members assigned half of their recovery to ICA. The district court annulled the agreements:

>This Court, pursuant to Rules 23(d)(5) and 83, Federal Rules of Civil Procedure, has the duty and authority to restrict communications that interfere with the proper administration of a class action and to restrict conduct that abuses the rights of members of the class. Furthermore, under Rule 23(e), the Court is a fiduciary who must protect the rights of absent class members. . . . Section 30.47 at p. 248 of the recently revised Manual For Complex Litigation Second, which deals with the administration of settlements in Class actions, states that "'[t]he court and counsel should be alert to the possibility of persons soliciting class members after the settlement, offering to provide collection services' for a percentage of the claims; such activities may fraudulently deprive class members of benefits provided by the settlement and impinge on the court's responsibility to control fees in class actions.'" The authors of the Manual specifically recognize that the court has the equitable powers to deal with this problem.

* * *

---

[23]Manual for Complex Litigation, Fourth § 21.662.

[24]Exhibit 6 (1985-2 Trade Cas. (CCH) ¶ 66,830 (D.D.C. 1985)).

[25]*Id.* at 1.

ICS and CSD are improperly soliciting for their own accounts half of the settlement proceeds to be paid to members of the Class, all to the prejudice of the members of the Class. The fifty percent contingent fee agreements that ICS and CSD are seeking to enter into with Class members are not based on any contingency, because a settlement has already been negotiated in this case. Accordingly, these contingent fee agreements are unenforceable.

* * *

ICS is improperly soliciting assignments of Class members' claims. CSD is improperly soliciting agency agreements, which are, in effect, an assignment of Class members' claims. These assignments and agency agreements are invalid because they are being purchased by ICS and CSD for the sole purpose of asserting a claim and effectively eliminate class members' control over their own claims. ICS and CSD themselves have suffered no injury by reason of the antitrust laws and have no connection with the transaction giving rise to the claims in this litigation.

* * *

The Court is vested with the power to regulate and define what activities constitute the practice of law. . . . A court also has the authority to maintain its freedom from the unauthorized practice of law. . . . The proper protection of members of the public requires that the court enjoin lay persons from the unauthorized practice of law.

* * *

A lay person may not represent another person or entity in federal court.

* * *

ICS is engaged in the preparation, completion and filing of claim forms with the court on behalf of Class members and advising Class members as to whether or not they are eligible to participate in the settlement and as to whether they should participate. ICS is engaged in writing and filing objections to a proposed settlement in a Class action on behalf of Class members. ICS has announced its intention to participate on behalf of Class members at a hearing before this Court to determine whether the proposed settlement should be

> approved by the court. Lay persons who perform any and all of these activities are engaged in the unauthorized practice of law. Accordingly, ICS and its president, Thomas Sievers, are engaged in the unauthorized practice of law.
>
> \* \* \*
>
> SD is engaged in the preparation, completion and filing of claim forms with the Court on behalf of Class members and advising Class members as to whether or not they are eligible to participate in the settlement. CSD is also engaged in advising Class members of the status of this litigation and the nature of the settlement. CSD has stated that it intends to assist Class members in maximizing their recoveries from the settlement fund, to monitor Class members' claims, to participate in and monitor the Court's post-filing proceedings, and to field Class members' questions while the disposition of the settlement is pending. Lay persons who perform any and all of these activities are engaged in the unauthorized practice of law. Accordingly, CSD and its president, Anthony Knowles, are engaged in the unauthorized practice of law.[26]

The Special Master notes that neither FRS, Johnson Recoveries, nor David Meyers has formally filed any papers in the record on behalf of any party. They have traded communications with the Special Master and the CADA, but have always made clear that they are not appearing as attorneys at this time.

---

[26]*Id.* at 5-7.

## Recommendations

The Special Master recommends the following:

1. That the Court adopt the allocations reflected in the spreadsheet attached as Exhibit 2.[27]

2. That the Court deny all other claims (whether they were filed timely or late, and whether they are listed in the attached exhibits or not).

3. That the Court direct the CADA to issue checks in the amounts listed in Exhibit 2, naming as payees the claimants listed in Exhibit 2, and mailing said checks to the claimant addresses as shown in Exhibit 2 (or to the last known address for the claimant).[28]

4. That the Court direct the CADA to commence the distribution of the settlement allocation checks within 20 business days of the date that the accompanying Order is signed and filed in the record.

5. That the Court direct the CADA to use its discretion to appropriately follow up on settlement allocations that go unclaimed more than 180 days from the date of distribution; that the Court direct the CADA to employ at least one of the following methods of due diligence: direct telephone calls to the contact number provided on the submitted claim form, sending of electronic mail to the email address provided on the submitted claim form, a follow up letter to the claimant informing them of the outstanding allocation amount, or additional address research using paid subscription services to locate the claimant; and that the Court direct the CADA to deliver any unclaimed settlement allocations to the appropriate entity for the state of last known address for the claimant after the passage of one year from the date of distribution.

---

[27]The Special Master directed the CADA to calculate the claimants' allocations based upon the recommendations herein. Those allocations are reflected in Exhibit 2. Sections III.9.2 and III.9.3 of the Stipulation and Agreement of Settlement require the Special Master and/or the CADA to circulate certain information (including that contained in Exhibit 2) to both Class Counsel and Cargill's counsel, both of whom are given a specified period to review said information. Both Class Counsel and Cargill's counsel have reviewed said information, and have waived the additional review time allowed under the Stipulation and Agreement of Settlement. If this Court rejects or modifies any of the recommendations herein, the Court should direct the CADA to recalculate the allocations accordingly.

[28]The Court's decision in this respect will depend upon its conclusions regarding Section II of this Report. The Court may wish to delay acting upon these recommendations until after considering the validity of FRS's and Johnson Recoveries's contracts.

6. That the Court grant the Special Master and the CADA the authority to determine the appropriate method for distribution of settlement funds to deceased claimants; and that the Court authorize the Special Master and the CADA to require notarized power of attorney, notarized affidavits of entitlement, court orders, or other court process as well as other appropriate identification as deemed appropriate or necessary.

7. That the Court direct the CADA to disburse the residual amount of $935,564.50 to Cargill, Incorporated.[29]

8. That the Court adopt this Report and Recommendations in full.

Baton Rouge, Louisiana, this 22nd day of July, 2013.

s/Daniel J. Balhoff
Daniel J. Balhoff (#18776)
Randi S. Ellis (#25251)

---

[29] This amount represents the "Residual" that must be returned to Cargill pursuant to Section 2.1.8 of the Stipulation and Agreement of Settlement. If this Court rejects or modifies any of the recommendations herein, the Court should direct the CADA to recalculate the Residual accordingly.